Robert WAYNE and Judy Wayne, individually and as parents, natural guardians, and next friends of Nicholas Jason Wayne, their son, a minor, Plaintiff–Appellants,

v.

Kenneth SHADOWEN, Terrell W. Powell, Keith Travis, Mike Wyatt, J.P. Lyles, Eddie Jones, and Randy Travis, Defendant–Appellees.

No. 00–5608.

United States Court of Appeals, Sixth Circuit.

July 23, 2001.

Before KRUPANSKY, BOGGS, and BATCHELDER, Circuit Judges.

KRUPANSKY, Circuit Judge.

In this civil rights action initiated under 42 U.S.C. § 1983, the plaintiff-appellants, Robert and Judy Wayne, a married couple (collectively "the Waynes" or "the plaintiffs;" individually "Robert" and "Judy," respectively), have assailed the district court's grant of summary judgment, anchored in qualified immunity, in favor of defendant-appellees Kenneth Shadowen ("Shadowen") and Terrell W. Powell ("Powell").[1] The Waynes' complaint alleged that Powell, as the principal of Benton Middle School ("Benton"), and Shadowen, as the superintendent of the Marshall County (Kentucky) School District (Benton's parent district) ("the District"), have deprived their minor son, Nicholas Jason Wayne ("Nick"), of his constitutionally-protected equal protection and due process rights while enrolled as a student at Benton, by placing him, as a disciplinary measure, in a special correctional classroom environment, for a substantial period, in the absence of a predicate formal hearing, and in violation of state law and school board policies. Nick's punishment was triggered by his repeated sexual harassment of a female classmate, in writing, using obscene and offensive language, even when adjudged by prevailing contemporary ultra-permissive standards of acceptable or excusable adolescent behavior.

Nick, born on March 17, 1982, had exhibited troublesome aberrant character and behavioral traits since a tender age. The record of this youth's pattern of serious misconduct at Benton commenced on or about April 14, 1995 when, while a thirteen-year-old seventh-grader, he disrespectfully expressed anger towards cafeteria staff members because he deemed his spaghetti to be unacceptably cold or lumpy. Nick demanded its immediate substitution with cost-free alternate fare. Because his impulsive whim was not instantly gratified, Nick shortly engaged in a tantrum. That display culminated in a public confrontation between Principal Powell and the boy. Powell characterized Nick's outburst as "disruptive, inattentive, disrespectful, sarcastic, and insubordinate."

That incident, coupled with a recent series of reports from Nick's teachers which chronicled a pattern of classroom misbehavior, and preying upon weaker students by verbal taunts and physical assaults, earned him a ten-day stint in Benton's "In–School Suspension Classroom Program" ("ISSC Program"), his first assignment to that corrective classroom environment.[2] The Marshall County Board of

1. The remaining five defendants are not parties to the subject appellate proceeding, as explained herein.

2. It should be well noted that the title, "In–School Suspension Classroom Program," is a misnomer, or at least a somewhat misleading apparent oxymoron. As commonly understood, a "suspension" from a school entails banishment from the school building, and all of its educational opportunities and options, for a finite duration. However, a student referred to the ISSC Program is "suspended" only from his ordinary classes, *not* from the school, for a temporary period. As evolved herein, the ISSC students continue to attend class on the school premises, and to complete their regular course work, while consigned to that program.

Education ("the Board") had created the ISSC Program by official resolution adopted on August 10, 1992, to meet the unique supervisory and disciplinary requirements of the rising number of behaviorally deviant pupils which have plagued many American educational districts in recent years. Under the Board's policies, a finding by the principal that a student had breached an official written school policy could trigger an assignment to the ISSC Program. As developed below, those policies simply articulate universally understood norms of acceptable student conduct.

The Board's August 10, 1992 resolution specified that the duration of a pupil's detention within the ISSC Program could range from a minimum of three days, to any greater number of days, as mandated by the principal in his sole discretion. Nonetheless, as a matter of regular policy and practice, any student's assignment to the ISSC Program for more than twenty days was reviewed by the District's superintendent. Students relegated to the alternative educational setting of the ISSC Program are segregated from the District's mainstream responsible, well-mannered, and non-disruptive schoolchildren to safeguard the effectiveness of the scholastic environment for those diligent and obedient youngsters; as well as to discipline, punish, control, and correct the miscreant element of the student population. Delinquent schoolchildren from grades six through eight remain together in the same classroom for the entire school day. However, each child committed to the ISSC Program is nevertheless required to complete daily instructional tasks assigned by his or her ordinary classroom instructor for each academic subject. The student's ordinary classroom teachers review and evaluate his or her work in the same manner as the product of all other students enrolled in the same regular class. The ordinary classroom instructors maintain regular direct communications with their students who are assigned to the ISSC Program.

At any given moment during any school day, a single certified teacher presides over the ISSC. The classroom proctor's primary duty is to maintain order among the unruly juvenile delinquents assigned to that classroom, which typically numbers approximately five or six youngsters, but which may rise to as many as twelve individuals, on any given day. Nevertheless, the educator assigned to supervise the ISSC Program gives individual attention to each student in the classroom, is available at all times to answer questions or offer guidance regarding a student's schoolwork, and generally ensures that the classroom environment remains conducive to study and learning, while each pupil completes his or her individual course assignments.

Apparently undaunted by his April 1995 ten-day introduction to the ISSC Program, Nick promptly gained re-assignment to that alternative classroom for three days very early in his eighth grade year, on or about September 25, 1995, after writing an obscene and humiliating note to a female classmate, Brandi Edwards ("Brandi"). That vulgar and hurtful missive stated:

> Dear Brandi,
>
> Hello you stupid bitch. You are a fucking idiot. I do not like your stupid goody goody ass. You act so fucking stupid. The only reason I thought you liked me was because Kristin told me you did you dumb slutty bitch. So go fuck your dad or something.
>
> Sincerely yours, you slutty bitch,
>
> Nicky Wayne

Although the Waynes did not protest Nick's consequent three-day referral to the ISSC Program (nor had they opposed his earlier April 14, 1995 ten-day place-

ment in that program for acting out in the lunchroom),[3] they evidently neglected to implement, at any time, any effective affirmative parental sanction designed to reinforce the school administration's discipline, so as to deter future grave misbehavior by their errant offspring,[4] other than short periods of mobility restriction and suspension of certain household privileges commonly known as "grounding."

Nick, apparently encouraged by the negative attention which was attainable by transgressing school regulations anchored in foundational social rules, standards, and conventions, and fortified by the consistent lesson of his historic experiences, at all times reinforced by his parents, that no serious adverse consequences would follow his impingement of those well-understood universal moral strictures, elected, on January 24, 1996, to escalate, to the next level, his personal challenge of the toleration limits of his school's authority figures, as well as to test the official indulgence of his disdain for the dignity of a fellow human creature. On that day, Nick handed his prior victim, Brandi Edwards, a second iniquitous communique, which, unlike his disparaging note of the previous semester, was not merely abusive and offensive, but which transgressed all boundaries of self-restraint, civilized propriety, and ordinary decency. That "letter," composed in the voice of a third person, recited:

> Dear Brandi,
>
> You ought to hear what I have been telling Nicky what [sic] I am going to do

---

3. The only complaints articulated by the Waynes related to Nick's April 1995 ten-day term in the ISSC Program were Robert Wayne's repeated demands, to Nick's English teacher and the administration, that the boy's "F" mark in a literature course for a nine-week grading period be elevated because, allegedly, his work suffered as a consequence of his extended assignment in the ISSC Program. Proof that Nick would have earned an "F" in the class even if the teacher had averaged only his scores earned prior to his placement in the ISSC Program failed to persuade Robert that Nick's time in that environment had not prejudiced his scholastic performance. Judy Wayne attested that Robert, who served as a volunteer basketball coach at Benton, was concerned only that the "F" mark might disqualify Nick from that team.

4. Robert Wayne's deposition testimony in this regard did not assist his case. He revealingly paraded his indulgent parental attitude by defending his son's September 25, 1995 foul prose, insisting that "in today's world, I don't know that it is [inappropriate]" for a thirteen-year-old boy to direct prurient and personally demeaning language towards a female schoolmate. He asserted that because the "f-word" can be heard on television, and because the Supreme Court ruled around 1970 that the First Amendment protects its use in certain public settings (see Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)), it is simply "not such a big offense" for modern children to use gutter language and accusations of sexual license to insult others. However, Robert ultimately conceded that his son had acted inappropriately by calling a schoolgirl a "stupid bitch" and by writing the overall sexually explicit contents of that message.

Additionally, irrespective of Nick's disciplinary record at Benton, Robert attested that "in my opinion, he did not have a problem meeting the [school's] disciplinary code." He then attributed Nick's behavioral troubles at Benton simply to normal youthful antics. Robert assigned blame for Nick's "F" in English to his teacher for refusing to allow him to do extra credit work to raise his failing grade, despite Nick's extended unacceptable performance in that class. He opined that ten days in the ISSC Program was an unjustifiably harsh sanction for Nick's April 1995 transgressions. He took every opportunity to excuse his son's involvement in the two January 1996 letters to Brandi Edwards, discussed below, and to minimize the significance of those actions. He similarly rationalized the behavioral abnormalities of his younger son Chris, who also compiled a disciplinary dossier at Benton. Robert even insinuated that Principal Powell harbored a personal grudge against the Wayne brothers.

to you. Told him I was going to make wild monkey love to you.

I said I was going to bend you over and spank you till your nice fine ass was red and then I will spank it some more. Then wham I just stuck it in so hard and deep. You will like it so much that you will be praying to the good lord above that you won't pass out before it is over. Then I will make you get on your knees and suck on my long heavy dick.

Your secret

Lover

?

The following day, January 25, 1996, Nick strove to surpass the nadir proximately achieved by his most recent performance by traumatizing the hapless Brandi with a third message. That handwritten pornographic note, on this occasion drafted in the first person, stated:

Dear Brandi,

I want to suck your large feminine tits until they are red and your hard nipples are nice and juicy. Then I will lick you all the way down to your deep never ending furry taco. Then I will eat you out like you have never been before. Then I will bend you over and make wild monkey love to you. I will do fast and hard like I know you like it, then I will gradually slow down until you are covered with my cremy [sic] cum [sic]. Then I will cum [sic] in your mouth and make you swallow it like a good girl.

Then I will fuck you some more just for the hell of it. You will be [illegible] you will want me to keep fucking you all night long and all the next day. Then this is where I leave. See ya later sweet thing.

Your secret Lover,

?

Later that same day, January 25, 1996, the distraught young girl alerted her guidance counselor that Nick had delivered those offensive notes to her. The counselor immediately notified Principal Powell, who immediately interviewed Brandi. Powell observed that the harassing notes had caused her severe distress. Immediately thereafter, Powell questioned Nick about Brandi's accusations. The lad confessed to delivering the two indecent letters to Brandi, but he denied having written them. Nick testified that he told Powell that he had only partially read the second of the two notes. He identified fellow student Lance Warmath ("Lance") as the author of both letters. Powell then interrogated Lance in Nick's presence. Lance admitted writing, at Nick's request, the first of the two notes; but he disavowed any knowledge of the second writing. The overall intelligence gathered by Powell's investigation at this stage conclusively established that, even if Nick had not written the notes, he at minimum knew their general nature and contents prior to delivering at least the second of them to the targeted female.[5]

**5.** Contrary to Nick's assertions, Powell testified that Nick had admitted to him that he knew the contents of *both* letters prior to delivering them to the girl. Ultimately, the principal generously indulged Nick with the benefit of a massive doubt by punishing him only for *delivering* the two sexually explicit notes to the schoolgirl, given that intelligence contrary to Nick's story, including Lance's account and the corroborating narratives of fellow students (*see* note 7 below), evinced that Nick had drafted the substance of both January 1996 letters, and that Lance had inked only the first of them, acting merely as Nick's scrivener. That version of material events carried the identifying ring of truth, given Nick's harassment of the same girl during the previous academic term, via an identical *modus operandi*.

Apparently, Nick had calculated to evade responsibility and punishment for his literary acts by creating technical defenses in the

Prior to determining a punishment appropriate for Nick's impudent transgressions, Powell, by telephone, personally invited Robert Wayne to meet with him at the school to discuss his son's antisocial behavior. During their ensuing meeting of the same day (January 25, 1996), Robert excused his wayward progeny's effrontery by protesting, in effect, that because Nick claimed that he had not physically transcribed the profane words onto paper, he should be absolved of any significant accountability for his admitted complicity in the torment of the young girl. In response, Powell explained to Robert that Nick's conceded delivery of the pornographic letters to an innocent young girl greatly exceeded the boundaries of common adolescent gender-based taunting or a sophomoric prank, and warranted severe punishment and corrective action, a concept which the boy's father refused to accept.[6] Powell advised Robert that Nick would incur immediate suspension for ten school days from Benton, and that the Waynes could appeal his disciplinary decision to Superintendent Shadowen.

On January 30, 1996, Powell interviewed additional students reported to have knowledge of the incidents at issue.[7] The next day, January 31, 1996, Powell and Shadowen conferred together about Nick's future status at Benton, given the gravity of his most recent offenses, matched with his repeatedly demonstrated non-comprehension of proper behavioral boundaries, absence of self-discipline, contempt for authority, and disrespect for the rights of others. After reviewing Nick's eventful disciplinary record, the two academicians resolved that, upon the February 13, 1996 expiration of Nick's ten-day suspension, he would be assigned to the ISSC Program until the close of the scholastic term in late May 1996. However, Nick would be afforded a "fresh start" at the commencement of his ninth grade year, in Autumn 1996.

During Nick's ten-day suspension, the Waynes requested a meeting with Shadowen, Powell, and school board chairman Keith Travis ("Travis"). The District arranged that meeting for February 7, 1996, at 8:00 p.m., to be conducted at the District's central office. On February 5, 1996, Powell relayed that information, via telephone, to the Waynes. Robert then informed Powell that he and his wife might not attend, irrespective of the scheduling of that meeting solely in compliance with the Waynes' request, but that they would

---

event that he was accused of harassing Brandi—namely that the first of his January 1996 notes referenced him in the third person, and was not inscribed in his handwriting, thus deflecting suspicion of authorship of both notes away from himself. However, the deceptive ploy failed in its larger purpose, because the principal punished Nick only for the mischief to which he had confessed, namely the delivery to Brandi of the two obscene exemplars.

6. At deposition, Robert Wayne testified that the sole sanction imposed by the Waynes for Nick's admitted January 1996 deliveries of the smutty letters to the same young girl who he had tormented in the recent past was a short two or three week period of "grounding."

7. Two pupils, Josh Smith and Kristin Browning, related that Nick told each of them that he wrote, or assisted in writing, the two harassing January 1996 notes to Brandi. Sabrina Ford revealed that she watched Nick write a note to Brandi in January 1996, which upset and disturbed Brandi after she received it. Dustin Ellenberger disclosed that he had read a "sick note" which someone had given to Brandi Edwards, and that Lance had told him that Nick had written it. Brian Van Metre reported that he saw Lance writing a note, together with Nick, which contained "graphic sexual language;" he observed Nick read that message, and Lance and Nick laughing about it.

timely notify Shadowen by telephone if they elected not to appear at the meeting. The Waynes failed to attend the February 7, 1996 meeting, after telephoning Travis, but not Shadowen or Powell, to report that they would not appear.[8]

On February 7, 1996, Shadowen drafted a letter to the Waynes by which he notified them of the final decision jointly made by he and Powell regarding their son, namely that, following the exhaustion of his ten-day suspension term, he would complete the eighth grade in the ISSC Program, and would be required to attend regular counseling sessions.[9]

Upon the February 13, 1996 lapse of Nick's ten-day suspension term, and thereafter, he failed to report to Benton. Powell unsuccessfully attempted to telephone the Wayne residence on February 13, 1996, and each school day thereafter, to express concern about Nick's prolonged truancy. Finally, on February 20, 1996, Powell reached Judy Wayne. She informed Powell that Nick was not truant, that he was at home, and that they (the Waynes) were "taking care of it." Several days later, Powell learned that the Waynes had enrolled Nick in a nearby parochial instructional institution, St. Mary's School, when that academy requested Nick's student records. The Waynes had not bothered to formally withdraw their son from the public school system, nor had they observed minimum standards of decent courtesy by initiating notice to Benton or the District that Nick would no longer be attending classes in the local common schools.[10]

On January 7, 1997, the Waynes initiated civil rights litigation under 42 U.S.C. § 1983[11] against Powell and Shadowen, as

---

**8.** The Waynes have claimed that they mailed a letter to Shadowen, dated February 5, 1996, by which they advised him that they would not attend the scheduled meeting. They have also asserted that they posted a letter to Shadowen dated February 8, 1996, by which they requested a hearing before the full Board. However, Shadowen testified that he had never seen either alleged letter until the Waynes introduced purported copies of them at his deposition.

**9.** In fact, those remedial measures were relatively lenient, given that the Board's official policies authorized even greater punishment for derelictions of the kind involved in the case *sub judice*, including final expulsion from the school system and/or corporeal punishment. See further discussion below.

**10.** On May 12, 1998, the principal of St. Mary's School, Rosann Whiting, testified that Nick's enrollment at that private academy had continued into his tenth grade year. She further revealed that Nick had continued to pose disciplinary problems, despite the structured and disciplined environment of that Catholic institution. Nick had sustained three "rule infractions" while in the ninth grade, and had received four detentions to

date during his as-yet-unfinished tenth grade year.

At the start of the 1996/97 scholastic year, the Waynes also matriculated their youngest son, Chris, at St. Mary's, because they believed that he also required a "new environment," to escape the disciplinary ramifications at Benton of his own behavioral abnormalities.

**11.** Section 1983 provides, in pertinent segment:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

In any action under section 1983, the plaintiff must prove that (1) he or she has been deprived of a right secured by the United States constitution or laws, (2) the defendants who allegedly caused that deprivation acted under color of state law, and (3) the deprivation occurred without due process of law.

well as each individual member of the school board. Revealingly, the Waynes did not request restoration of their son to the status of a mainstream student within the Marshall County public school system;[12] rather, they demanded a monetary payoff, including allegedly "compensatory"

O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994).

12. Given that Nick's assignment to the ISSC Program had expired prior to the beginning of his ninth grade year in Autumn 1996, and hence prior to the January 7, 1997 inauguration of the subject lawsuit, Nick could have matriculated in the public high school as an ordinary student.

13. In their reply brief, the plaintiffs, in a bid to justify their lawsuit, characterized themselves and their son as civil rights crusaders of the stature of Rosa Parks, the heroine of the 1955 Montgomery bus boycott and celebrated "mother of the civil rights movement," an obviously exaggerated inappropriate comparison.

14. In their opening brief, the plaintiff-appellants stipulated that they have asserted their claims against the defendants solely in their individual capacities, rather than their official capacities, to avoid potential Eleventh Amendment state immunity issues. See, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Because the plaintiffs had framed no "official capacity" claim against any agent of the Marshall County School District, this reviewing court expresses no view regarding the relationship between that entity and the Eleventh Amendment. See generally Mumford v. Basinski, 105 F.3d 264 (6th Cir.1997); Doe v. Claiborne County, Tenn., 103 F.3d 495 (6th Cir.1996).

However, assuming, without deciding, that "official capacity" claims could have been asserted against the defendants, summary dismissal of those claims, if asserted, would have been appropriate, because, as illustrated herein, the defendants had committed no constitutional tort against Nick which could be attributed to their employer. See Scott v. Clay County, Tenn., 205 F.3d 867, 879–80 (6th Cir.), cert. denied, 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000).

damages, punitive damages, and attorney fees.[13] The Waynes' complaint alleged that the defendants, as state actors,[14] had deprived Nick of his equal protection and due process rights safeguarded by the Fourteenth Amendment to the United States Constitution,[15] as well as the Kentucky Constitution.[16]

15. The Fourteenth Amendment posits, in relevant part, that "No state shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

The Waynes' complaint also cited the Due Process Clause of the Fifth Amendment. "The Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government. See generally Sturgell v. Creasy, 640 F.2d 843, 850 (6th Cir.1981); Walker v. Hughes, 558 F.2d 1247, 1257 (6th Cir.1977). Ergo, the instant complainant's citation to the Fifth Amendment Due Process Clause was a nullity, and redundant of her invocation of the Fourteenth Amendment Due Process Clause." Scott v. Clay County, Tenn., 205 F.3d 867, 873 n. 8 (6th Cir.), cert. denied, 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000).

16. The plaintiffs have not included, in the Joint Appendix, their opposition to the defendants' summary judgment motion; therefore, they have failed to demonstrate that they had properly pursued any independent Kentucky law claim before the initial forum. Although the plaintiffs' complaint suggested that they would advance separate state constitutional claims within the federal court's supplemental jurisdiction, see 28 U.S.C. § 1367, they failed to develop, before the district court, any coherent non-federal cause of action anchored solely in the Kentucky constitution or the laws of that state. Accordingly, the district court's opinion omitted assessment of any hypothetical Kentucky law claim(s), as the plaintiffs knowingly waived any potential cause of action buttressed solely by state law. Because the plaintiffs have knowingly abandoned any Kentucky law cause of action, none can be resurrected on appeal. See, e.g., United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United

Following discovery, including the depositions of twenty-six witnesses, the defen- dants moved for summary judgment under Fed.R.Civ.P. 56,[17] anchored in the defense of qualified immunity.[18] The district court

*States v. Universal Management Services, Inc.,* 191 F.3d 750, 759 (6th Cir.1999), *cert. denied,* 530 U.S. 1274, 120 S.Ct. 2740, 147 L.Ed.2d 1005 (2000).

17. "The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (brackets added).

The familiar standards governing summary judgments have been recently re-articulated by this court:

A court may grant summary judgment under Fed.R.Civ.P. 56 only if, after construing the record evidence, and the reasonable inferences which may be drawn therefrom, most favorably for the party opposing the motion, the proof could not support a judgment in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non- movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted). *See also Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Adams v. Metiva,* 31 F.3d 375, 379 (6th Cir.1994).

All legal conclusions by lower courts are scrutinized *de novo. Grider v. Abramson,* 180 F.3d 739, 746 n. 7 (6th Cir.), *cert. denied,* 528 U.S. 1020, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999); *Brennan v. Township of Northville,* 78 F.3d 1152, 1154, 1156 (6th Cir.1996). Hence, a lower court's summary judgment award is subject to plenary review, because the sufficiency of the record evidence, construed most favorably for the opponent of summary judgment, poses a question of law. *See Doe v. Claiborne County,* 103 F.3d 495, 505 (6th Cir.1996). The touchstone is "whether the evidence presents a sufficient disagreement to re- quire submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Wil- liamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (*quoting Anderson,* 477 U.S. at 251–52).
*Graham–Humphreys v. Memphis Brooks Mu- seum of Art, Inc.,* 209 F.3d 552, 556–57 n. 7 (6th Cir.2000) (ellipse omitted).

18. In certain circumstances, public employ- ees who are sued for damages in their individ- ual capacities may be insulated from section 1983 litigation by the doctrine of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 808, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The contours of qualified immunity have been succinctly summarized by the Sixth Circuit:

"Qualified or 'good faith' immunity is an affirmative defense that is available to gov- ernment officials performing discretionary functions." *Rich v. City of Mayfield Hts.,* 955 F.2d 1092, 1094 (6th Cir.1992). By operation of that doctrine, those officers generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established feder- al statutory or constitutional rights of which a reasonable person would have known.
*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
Accordingly, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be insulated by qualified immunity. *Id.* Thus, even if a public officer has deprived the plaintiff of a federal right, qualified immunity will apply if an objective reasonable official would not have understood, by referencing clearly es- tablished law, that his conduct was unlaw- ful. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Rich,* 955 F.2d at 1095. The question whether an asserted federal right was clearly established at a particular time presents an issue of law subject to plenary review. *Elder v. Hollo- way,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). "In inquiring whether

dismissed the case against the five individual members of the school board, namely defendants Keith Travis, Mike Wyatt, J.P. Lyles, Eddie Jones, and Randy Travis, based upon the plaintiffs' stipulation that those defendants were entitled to qualified immunity as a matter of law. Moreover, overruling the Waynes' opposition, the presiding judge also granted summary judgment to defendants Powell and Shadowen, ruling that, on the instant discovery record, those defendants were equally protected against the subject federal civil rights lawsuit by qualified immunity.[19] The plaintiffs have appealed only the district court's March 30, 2000 award of summary judgment to Powell and Shadowen.

"In performing the qualified immunity analysis, the court must initially determine if a plaintiff possessed a constitutional right that had been invaded." *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 994 (6th Cir.1994) (citation omitted). If the alleged violation of the plaintiff's constitutional right did *not* occur, the defendant is entitled to immediate judgment; whereas if the alleged constitutional violation *did* occur, or *may have* occurred, the court should proceed with the qualified immunity inquiry. *Id.* at 995.

■ As its seminal analytic point of departure, this reviewing court emphases that *no child in America, irrespective of any particular status or condition, possesses any affirmative federal constitutional entitlement to a publicly-funded, tuition-free education.* *Papasan v. Allain*, 478 U.S. 265, 284, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (remarking that public education "is not among the rights afforded explicit protection under our Federal Constitution.") (*quoting San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)); *Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Public education is not a 'right' granted to individuals by the Constitution.") (*citing*

a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir.1993) (citation omitted).

"The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Rich*, 955 F.2d at 1095. Claims of qualified immunity are assessed on a fact-specific basis to ascertain whether the particular conduct of the defendant state employee infringed a clearly established federal right of the plaintiff, and whether an objective reasonable officer would have believed that his conduct was lawful under extant federal law. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

*Painter v. Robertson*, 185 F.3d 557, 566–67 (6th Cir.1999) (brackets and note omitted).

Recently, the Sixth Circuit has re-emphasized the encompassing scope of the qualified immunity doctrine:

The insulation from federal civil rights litigation bestowed upon state governmental personnel by qualified immunity sweeps broadly, affording them "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir.1998) (*quoting Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

*Scott v. Clay County, Tenn.*, 205 F.3d 867, 874 n. 9 (6th Cir.), *cert. denied*, 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000).

19. The trial court's judgment concluded:

[T]he Court finds that no action taken by Powell or Shadowen was outside the bounds of reason under all of the circumstances at the time. There is no evidence that either of them violated any written or otherwise established law, rule, policy, or regulation which applied to the manner in which the student was charged and punished for his admitted misbehavior. Accordingly, Powell and Shadowen are entitled to summary judgment based on the affirmative defense of qualified immunity.

*Rodriguez*, 411 U.S. at 35); *see also Goss v. Lopez*, 419 U.S. 565, 572, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

▮ Rather, state-sponsored, universally available, tuition-free primary through secondary instruction for school-aged residents is a "police power" matter largely reserved, in the American federal system, to the states and their subordinate administrative arms, branches, and instrumentalities, including municipalities, counties, and local school districts. *See generally Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. By and large, public education in our Nation is committed to the control of state and local authorities.") (ellipse omitted) (*quoting Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)); *Brown v. Board of Education of Topeka*, 347 U.S. 483, 489–93 & n. 4, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (exploring the evolution of free public education in the United States into "perhaps the most important function of state and local governments."). "When social or economic legislation is at issue," including

state laws or actions within the traditional "police power" realm involving promotion of community health, safety, welfare, and morals, the Constitution affords the states and their agents "wide latitude."[20] *37712, Inc. v. Ohio Department of Liquor Control*, 113 F.3d 614, 622 (6th Cir.1997) (citations omitted).

▮ However, if a state elects to furnish free compulsory public education to *any* of its citizens (as does Kentucky),[21] it must do so in a manner, respecting *all* of its residents, which comports with basic Fourteenth Amendment equal protection and due process strictures. *See Brown*, 347 U.S. at 493 ("Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."); *Goss*, 419 U.S. at 572–75 (explaining that, when state law has guaranteed access to a free public education, a beneficiary of that statutory entitlement may be denied that right only if the state effected that deprivation in conformity with due process requisites).

The Waynes' confused equal protection argument appears to be anchored in the contention that the defendants unjustifi-

(Citations omitted).

20. Like the federal courts, the Kentucky courts generally defer to the policies, rules, and regulations formulated by school officials, as long as they do not conflict with the law. *See Dorsey v. Bale*, 521 S.W.2d 76, 78 (Ky. 1975) ("courts should be reluctant to substitute their judgment for that of the school officials who promulgate the rules and regulations.").

21. The Constitution of Kentucky, Section 183, posits that the commonwealth's "General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Accordingly, the Kentucky legislature has duly enacted statutes which have enabled the creation of publicly-supported schools throughout that state. Ky.Rev.Stat. Ann. § 158.010 (Banks–Baldwin 2000). Attendance is generally com-

pulsory for school-aged children, Ky.Rev.Stat. Ann. § 158.010 (Banks–Baldwin 2000), with certain narrow exceptions. Ky.Rev.Stat. Ann. § 159.030 (Banks–Baldwin 2000). Unlike federal constitutional jurisprudence, Kentucky constitutional and statutory law mandate that "[t]he Commonwealth is obliged to furnish every child in this state with an education in the public schools[.]" *Fannin v. Williams*, 655 S.W.2d 480, 484 (Ky.1983). *See also Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 189–90 (Ky.1989) ("The framers of our [state] constitution intended that each and every child in this state should receive a proper and an adequate education, to be provided for by the General Assembly.") (italics omitted); *id.* at 212 ("A child's right to an adequate education is a fundamental one under our [Kentucky] Constitution. The General Assembly must protect and advance that right.").

ably denied Nick the equal enjoyment of a "free, appropriate public education"[22] vis-a-vis his peers by enrolling him in the ISSC Program for the final four months of the 1995/96 school year. "The Equal Protection Clause requires public institutions [including public schools] to 'treat similarly situated individuals in a similar manner.' " *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir.1996) (brackets added) (*quoting Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988)). "In opposition to a motion for summary judgment, it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Id.* at 1360 (citation omitted).

■ In the case *sub judice*, the Waynes have primarily contended that, following the expiration of Nick's ten-day suspension, he should not have been treated substantially different than the run-of-the mill student at Benton. However, Nick patently was not "similarly situated" to the typical student at Benton. Rather, at minimum, Nick posed (1) unique disciplinary and control challenges to the school's administrators and educators; (2) an extraordinary menace to the psychological, and perhaps physical, well-being of at least one fellow student (Brandi Edwards); and (3) a singular threat to the District's financial soundness by exposing it to potential litigation and consequent monetary losses if it (the District) had not taken swift and sure corrective and/or preventative action in light of Nick's sexual harassment of a classmate.[23]

**22.** The Waynes' appellate briefs repeatedly invoke the terminology "free, appropriate public education" to characterize Nick's alleged state law entitlement. However, no Kentucky authority cited therein bestows upon any Kentucky resident a claim of right to a "free, appropriate public education." Rather, that verbiage derives from a federal statutory scheme known as the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, which was "designed to give *children with disabilities* a free appropriate public education designed to meet their unique needs." *Burilovich v. Board of Education of Lincoln*, 208 F.3d 560, 565 (6th Cir.), *cert. denied,* ─ U.S. ─, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000) (emphasis added). *See* 20 U.S.C. § 1401(8), which posits that a " 'free appropriate public education' means *special education* and related services" for qualified children having a statutorily defined learning disability. (Emphases added). The plaintiffs have not stated any IDEA claim, nor have they alleged that IDEA is in any way relevant to the action *instanter*, nor have they produced any evidence that Nick is "learning disabled" in any statutorily meaningful way. *See* 20 U.S.C. § 1401(3)(A), which defines "child with a disability," and 20 U.S.C. § 1401(26), which defines a "specific learning disability." Neither definition encompasses any condition related to being an overindulged, mean-spirited bully.

To the contrary, the pertinent Kentucky authority speaks of the average school-aged child's state-created right to "a proper and an adequate education" at public expense. *See* note 21 above (*citing Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 189–90 (Ky.1989)). The plaintiffs' repeated erroneous invocation of an irrelevant federal standard exemplifies the misconceptions underlying the claimants' advocacy in this litigation.

**23.** *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (resolving that, in proper cases, a public school district may be liable for monetary damages under Title IX of the federal Education Amendments Act of 1972, as amended [20 U.S.C. § 1681 *et seq.*], for failing, with "deliberate indifference," to implement adequate remedial measures designed to prevent severe instances of "student-on-student" sexual harassment, where the school district had actual notice of the ongoing harassment); *Horner v. Kentucky High School Athletic Ass'n*, 206 F.3d 685, 692 (6th Cir.) (construing *Davis* ), *cert. denied,* 531 U.S. 824, 121 S.Ct. 69, 148 L.Ed.2d 34 (2000). *Accord, Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (involving sexual harassment of a public school pupil by a teacher). The natural parents, as well as the step-parents, of Brandi Edwards had met

The plaintiffs have produced no evidence that the insolence, rude disruptiveness, unabashed defiance, and/or callous offense to the moral dignity of a fellow human being, which have characterized Nick's pattern of misbehavior at Benton, typifies the conduct of the average mainstream student at that institution. More specifically, the plaintiffs have not produced evidence that any Benton student who had sustained a lesser penalty than the January 1996 corrective measures imposed upon Nick had ever handed a thirteen-year-old female schoolmate even one, let alone two, abusive pornographic notes. Shadowen testified that, prior to the subject incidents, several Benton students other than Nick had completed a school year within the ISSC Program, and a few were so assigned at the request of the subject child's parents. Powell corroborated that testimony, and also recalled that at least one pupil had remained in the ISSC Program from November until the school year's end the following May, a considerably longer duration than Nick's February–to–May assignment to that alternative educational environment.

■ Furthermore, the complainants' protest that "the educational opportunities for Nicky in the ISSC were 'significantly different from or inferior to' the educational opportunities he was receiving in the regular classroom," in a constitutionally unjustifiable manner, was unsupported.[24] Kentucky law obligated the District to supply Nick with "a proper and an adequate education." However, state law did *not* entitle Nick to the *best possible* education attainable, nor to instruction administered under *ideal conditions,* nor to academic opportunities which conformed to any self-acclaimed expert's subjective *ideal vision* of a perfect education.

■ After construing all admissible record evidence most favorably for the plaintiffs, including their allegations of imperfections in the ISSC Program, it cannot be gainsaid that, given Nick's unique circumstances, which he had solely created by his volitional commission of harassing misdeeds ranging from impertinent contempt of authority to the malicious torment of a callow girl, the Waynes cannot prove that the education available to Nick within the

---

with Shadowen following Nick's verbal molestation of their daughter via the two detestably dissolute January 1996 letters.

24. As purported evidence of the comparative inferiority and averred unacceptability of the education which Nick would have received while enrolled in the ISSC Program, the Waynes submitted an "expert" affidavit by, and deposition testimony from, Dr. Joan Lester ("Dr. Lester"), a Kentucky music teacher and school administrator with a doctorate in music education who had never met Nick, his parents, Brandi Edwards, her parents or stepparents, Lance Warmath, Powell, Shadowen, any other representative of the Marshall County School District, or any person with knowledge of the subject incidents or the ISSC Program at Benton. The record lacked adequate proof to support her professional competency to issue the many conclusory value judgments contained in her testimony and

affidavit; or that her subjective philosophical judgments were the products of any scientific theory, principle, method, or procedure which has been subjected to testing or peer review and publication, or has been accepted by a significant number of the members of her profession; or were reliable for any other objective reason. See *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 1141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the trial judge did not abuse his discretion by ignoring Dr. Lester's testimony and affidavit in his written opinion bestowing summary judgment for the defendants, which omission reflected an implicit (and justified) conclusion that Dr. Lester's opinions were unreliable and/or irrelevant and hence inadmissible. *Kumho Tire,* 526 U.S. at 142.

ISSC Program environment would not have been "proper and adequate."[25] Accordingly, Nick would have received everything by way of a free appropriate education which the state, by its laws, had promised him.

█ In their reply brief, the Waynes belatedly emphasized that Lance Warmath, the student who Nick had claimed transcribed the two foul narratives of January 1996, incurred only four days in the ISSC Program for his contribution to the harassment of the female pupil. However, "issues raised for the first time in a reply brief are not properly before this court." *Grider v. Abramson*, 180 F.3d 739, 750 n. 14 (6th Cir.) (brackets and citation omitted), *cert. denied*, 528 U.S. 1020, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999).

Moreover, even if the plaintiffs had timely advocated Lance's punitive circumstances as an averred comparable, that effort would have been unavailing. Lance testified that he had scribed only the first of the two January 1996 letters, that he had done so at Nick's behest, and that Nick had dictated its contents to him. At any rate, even if Lance rather than Nick had been the primary instigator of the harassment, the fact that Nick had delivered the distasteful notes to Brandi would rationally justify a harsher punishment for Nick, as the damage for which the boys were punished was done when that smut was given to its intended victim. Moreover, Lance's testimony that he had incurred two days in the ISSC Program during the previous school year on an isolated vandalism charge fell substantially short of evidence that Lance's overall record of disciplinary incidents was comparable, in numerosity, proximity,

---

**25.** In fact, Nick avowed that his academic performance did not suffer during his previous commitments to the ISSC Program. Lance attested that he also performed well scholastically while in the ISSC Program, and that the major differences between the ISSC and a traditional classroom were the physical isolation and movement restrictions of the ISSC. Indeed, the underlying premise of the Waynes' equal protection argument, namely that, to be *equal*, the education afforded to Nick must be *identical* to that offered to all other students within the District, was fundamentally misconceived. Patently, different children have different educational needs; an education which is "proper and adequate" for one student may not be "proper and adequate" for another. In recognition of that truth, public school systems all over this nation "track" students according to, among other things, their intellectual abilities, artistic talents, personal interests, career aspirations, college plans, and the like, often by assignments to alternative vocational or "magnet" schools. Obviously, the educational program offered to students on any given "track" is not identical to that available to pupils within the same school system placed on a different "track," nor should it be, if "tracking" is to benefit the participating schoolchildren. In accord with that general principle, the Marshall County School District's Policy Statement contained within its Student of Code of Conduct recited, *inter alia*, that all students in the District have a "right" to "a system of public education *which meets the needs of the individual student*." (Emphasis added).

The defendants rationally determined that Nick's individual needs required his isolation from the mainstream student body, for the sake of his own educational nurture and ethical character development (by enhancing his learning environment via removing potential distractions as well as by furnishing intensified structure and discipline which he had not received at home), and for the benefit of his fellow students (by protecting the pedagogical milieu for well-behaved and studious pupils, and by quarantining him from his repeatedly targeted victim, Brandi Edwards).

At bottom, Nick received the fundamentals of a "proper and adequate" public education while studying in the ISSC Program, namely daily reading and writing assignments in each of his courses; regular instructor contact, feedback, and assistance, including individual attention given to his academic progress; and a monitored, supervised learning environment.

and/or severity, to Nick's compilation of prior turpitude-infested misdemeanors. Hence, material distinctions been Nick and Lance existed, which rationally justified a comparatively harsher sanction against Nick.

Thus, the plaintiffs have failed to produce sufficient evidence which could lead a rational fact-finder to conclude that any student similarly situated in "all relevant respects" to Nick had received comparatively favorable disparate treatment from the defendants. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

The plaintiffs' alternate due process theory is similarly ill conceived.[26] Beyond dispute, Nick had a Kentucky law property right to "a proper and an adequate education" at public charge, and a liberty interest in his reputation and good name, which rights could not be abridged by the defendants without predicate conformity to proper state-created procedures. In turn, those official procedures were required to satisfy the minimum judicially-fashioned federal due process standard of notice and an opportunity to be heard prior to an official deprivation of a state-created property or liberty interest. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538–42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Goss v. Lopez*, 419 U.S. 565, 572–84, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

Kentucky legislation empowers local school boards to "formulat[e] a code of acceptable behavior and discipline to apply to the students in each school operated by the board." Ky.Rev.Stat. Ann. § 158.148(4) (Banks–Baldwin 2000). "The code shall contain the type of behavior expected from each student, the consequences of failure to obey the standards, and the importance of the standards to the maintenance of a safe learning environment where orderly learning is possible and encouraged." Ky.Rev.Stat. Ann. § 158.148(4)(b) (Banks–Baldwin 2000). "The principal of each school shall apply the code of behavior and discipline uniformly and fairly to each student at the school without partiality or discrimination." Ky.Rev.Stat. Ann. § 158.148(4)(c) (Banks–Baldwin 2000).

Kentucky law provides that a student may be disciplined, by suspension or expulsion, for, among other things, "[w]illful disobedience or defiance of the authority of the teachers or administrators, use of profanity or vulgarity, ... abuse of other students, the threat of force or violence,

---

**26.** The plaintiffs' confounded due process argument appears to have both substantive and procedural aspects. However, only their *procedural* due process posture warrants substantial analysis.

An official action violates *substantive* due process requisites if it was "arbitrary and capricious, bearing no relation to [any legitimate exercise of] the police power." *Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 676, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) (brackets added); *see also Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988). The Due Process Clause substantively safeguards citizens against the arbitrary exercise of the powers of government. *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "The substantive component of the Due Process Clause protects students against abusive government power as exercised by a school." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 506 (6th Cir.1996). However, if any conceivable legitimate state interest is rationally furthered by the faulted state action, it is not "arbitrary and capricious" or "abusive." *See Curto v. Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992). Once again, as developed herein, the defendants had rational reasons for assigning Nick to the ISSC Program until the conclusion of his eighth grade year. Given that Nick's situation in the ISSC Program had not diminished the propriety and/or adequacy of his education at Benton, the plaintiffs' substantive due process argument is summarily discarded.

... or other incorrigible bad conduct on school property." [27] Ky.Rev.Stat. Ann. § 158.150(1)(a) (Banks–Baldwin 2000). "The superintendent, principal, assistant principal, or head teacher of any school may suspend a pupil but shall report the action in writing to the superintendent and to the parent, guardian, or other person having legal custody or control of the pupil." Ky.Rev.Stat. Ann. § 158.150(5) (Banks–Baldwin 2000). However, *prior* to a student's suspension, specified processes normally must be followed:

A pupil shall not be suspended from the common schools until after at least the following due process procedures have been provided:

(a) The pupil has been given oral or written notice of the charge or charges against him which constitute cause for suspension;

(b) The pupil has been given an explanation of the evidence of the charge or charges if the pupil denies them; and

(c) The pupil has been given an opportunity to present his own version of the facts relating to the charge or charges.

These due process procedures shall precede any suspension from the common schools unless immediate suspension is essential to protect persons or property or to avoid disruption of the ongoing academic process. In such cases, the due process procedures outlined above shall follow the suspension as soon as practicable, but no later than three (3) school days after the suspension.

Ky.Rev.Stat. Ann. § 158.150(4) (Banks–Baldwin 2000).[28]

■ As developed above, Principal Powell followed all appropriate established procedures predicate to Nick's ten-day suspension for delivering the two harassing January 1996 notes to Brandi. The plaintiffs have not controverted that Nick's admitted misconduct transgressed valid District standards of student deportment. Likewise, no dispute exists that, prior to dispensing final discipline, the principal interviewed the alleged victim (Brandi), the alleged perpetrator (Nick), his accomplice (Lance), and other students reported to have knowledge of the incident. Most importantly, for procedural due process purposes, the lynchpin event transpired when Nick *confessed* to delivering the two profane notes, with culpable knowledge of their corrupt general contents.

■ At that point, Powell had conducted all of the predicate investigation which constitutional due process required prior

---

**27.** The Marshall County Schools Student Code of Conduct, adopted by the Board and distributed to all students, states that each student has the responsibility, among other things, to "show[ ] consideration for the rights ... of others," "refrain from ... abusive language, ... or using threats or intimidation against any other person," "practice self-control at all times," and "follow the rules and regulations of the Board of Education and/or the school administration."

**28.** The Official Policies of the Marshall County School Board provide that "[i]n accordance with KRS [Kentucky Revised Statutes] 158.150, the Principal or assistant Principal may suspend a pupil up to a maximum of five (5) days per incident." Further, those policies stipulate that "[a] pupil may not be suspended for more than a total of ten (10) days per incident." In addition, the Board's resolutions direct that the District will follow the due process procedures outlined in Ky.Rev. Stat. Ann. § 158.150 (Banks–Baldwin 2000), quoted above.

The Student Code of Conduct explicitly states that the principal has the right to "suspend any students whose conduct disrupts the educational process." It further quotes the provisions of Ky.Rev.Stat. Ann. § 158.150 (Banks–Baldwin 2000) which list valid reasons for suspending a student, and that section's predicate due process requirements, recited above.

to suspending Nick for ten days. *See Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (ruling that, prior to suspension of a public school pupil for a period of ten days or less, a school administrator must follow "fundamentally fair procedures *to determine whether the misconduct had occurred.*") (emphasis added); *id.* at 580–82 (explaining that, if, after receiving oral or written notice of the charges against him, *the student denies the accusations,* fundamental fairness requires that he be informed of the evidence against him and afforded an informal opportunity to tell his side of the story).[29]

Furthermore, even if Powell had based his suspension decision upon a conclusion that Nick had in fact *composed* the two lewd January 1996 letters to Brandi, Nick nonetheless still had received all the "process" to which he would have been "due." Powell had duly investigated the charge by interviewing the accuser (Brandi), Nick's alleged accomplice (Lance), and Nick himself. Powell confronted Nick with Brandi's accusations and Lance's account, and gave Nick an opportunity to tell his side of the story. Lance's claim that he had merely transcribed Nick's dictation to create the first of the January 1996 letters, was highly credible, given Nick's known authorship of an indecent and offensive

writing to the same girl during the previous semester. Conversely, Nick's claims that he had no part in the drafting of the profane January 1996 notes, and had read only a part of the second note, were, under the circumstances, facially unworthy of belief. Nevertheless, Powell conducted further investigation by interviewing additional student witnesses, who generally corroborated that, although Lance had penned one or both of the tormenting sex fantasies, Nick had composed the harassing literature. *See* notes 5 and 7 above.

▮ Powell determined that each of Nick's two January 1996 offenses warranted five days' suspension from the school, totaling ten days of out-of-school suspension, which was within his lawful authority. *See* note 28 above. The Waynes have protested that Powell denied Nick due process by failing to arrange a formal hearing before the Board prior to his suspension. However, a hearing before the Board is required under Kentucky law (Ky.Rev. Stat.Ann. § 158.150(2) (Banks–Baldwin 2000)), and the coordinate official policies of the Marshall County School Board, only in cases of student *expulsion.* Because a ten-day suspension is not a permanent expulsion from the public school system, Nick had no right, under either Kentucky law or the Fourteenth Amendment's due

---

**29.** The *Goss* Court elaborated:

> There need be no delay between the time "notice" is given and the time of the hearing. *In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.*

*Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). (Emphasis added).

> Because the "notice" and "opportunity to be heard" requirements were fashioned to safeguard the innocent against undeserved

punishment, the Waynes' protest that Nick had been deprived of a liberty interest in his good name and overall reputation by his prolonged placement in the ISSC Program was a red herring. As explained by the *Goss* Court, a student's interest in preserving his or her good name and general reputation constitutionally requires that minimum due process be accorded to the pupil prior to the administration's determination of his or her *guilt* of the charged misconduct. *Id.* at 574–75, 580–82. That requirement was satisfied in this case. Nick has only himself to fault if his good name and reputation were injured by the consequences of his obscene literary assaults against a female classmate.

process clause, to a formal hearing before the Board predicate to his ten-day suspension. *See Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

■ In response, the Waynes have contended that Nick's extended assignment to the ISSC Program, following his ten-day suspension, was a "constructive expulsion" from the common school system, which should have been preceded by a formal hearing before the Board.[30] That contention was facially misconceived. Nick had been scheduled to resume his studies at Benton immediately following completion of his lawful ten-day suspension. The only condition upon his reinstatement at Benton was that he would do all of his schoolwork in the ISSC Program for the balance of his eighth grade year. Patently, that restriction was not tantamount to permanent and complete expulsion from the school system. As developed herein, Nick would have received all of the basic fundamentals of a "proper and an adequate education" while in the ISSC Program, with the added benefit of a monitored, disciplined environment which would have been more suitable than the traditional classroom to the individual instructional needs of this recalcitrant recidivist serious offender.

■ Principal Powell's decision, made in consultation with and with the assent of Superintendent Shadowen, to place Nick in the ISSC Program for the remainder of the 1995/96 academic year, was authorized by the Board's resolution entrusting all such student assignments to the principal's discretion. The complainants have failed to mount a colorable case that Nick was entitled to any more "process" than that which he had received prior to the final disciplinary decision of Powell and Shadowen. Nick had *admitted* the wrongdoing which instigated his placement in the ISSC Program. Accordingly, no useful purpose would have been served by conducting any further inquest into Nick's conduct; or by affording him any further opportunity to be heard; at least where, as here, the education which he would have received in the alternative ISSC environment would satisfy minimum state law standards of propriety and appropriateness. *See Buchanan,* 99 F.3d at 1359 (resolving that a disciplined public school student "may not have procedural due process rights to notice and an opportunity to be heard when the sanction is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school.") (citations omitted).[31] As developed herein, the education which Nick would have received in the ISSC Program would have been, in a constitutional sense, neither "significantly different from," nor "inferior to," that which was available in the traditional classrooms, in light of Nick's unique individual needs.

---

**30.** Although the plaintiffs have conceded that Nick had not been expelled from Benton, and therefore the governing state statutes and Board policies did not technically require any predicate hearing before the Board, they have nevertheless argued, as best as can be comprehended, that the purported denial of educational benefits which allegedly accompanied his extended assignment to the ISSC Program was sufficiently similar to complete expulsion from the school system for due process to demand a predicate formal Board hearing.

**31.** *Accord, Goss v. Lopez,* 419 U.S. 565, 580–84, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (stressing the need for "immediate, effective action" to enforce discipline in public schools, and suggesting, by negative implication, that discipline less invasive of the student's state-given property right to an education, than physical suspension from the school, which would bring his consequent extirpation from all of the academy's educational opportunities and options, may not trigger *any* predicate due process requirements).

Accordingly, when all record evidence is construed most favorably for the plaintiffs, they have failed to muster any sustainable constitutional attack against the defendants' implicated actions and decisions. Rather, the defendants respected all of Nick's equal protection and due process rights in imposing entirely appropriate, and indeed relatively benign, discipline for his admitted transgressions. Because, after construing all record evidence in the light most favorable to the plaintiffs, the defendants have impinged none of the boy's asserted constitutionally protected interests, summary judgment for defendants Shadowen and Powell is **AFFIRMED**.

Judges BOGGS and BATCHELDER concur in the result only.