adequate post-deprivation remedy. *See id*. It is undisputed that the Hamiltons received notice of the seizure on the day of the seizure – November 16, 1996. After removing the boat, the TWRA discovered that it was registered to Hamilton, but it did not return the boat to Hamilton at that time because it wanted to conduct further investigation into who was actually using the boat/blind when it was left unattended. Wildlife agencies have procedures for claiming seized property but, because the Hamiltons' property was returned within 10 days, those procedures are inapplicable here. *See* Tenn. Code Ann. § 70-6-204 (providing for hearings).

In light of the forgoing discussion, this court holds that the Hamiltons have not met their burden of demonstrating that the defendants violated clearly established rights of which a reasonable official would have been cognizant on November 16, 1996. Thus, the district court was correct in its determination that the defendants sued in their individual capacities are entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of the Hamiltons' claims against the TWRA employees sued in their individual capacities. We REVERSE the district court's holdings (1) that the Hamiltons had no constitutionally protected property interest in Reelfoot Lake or its submerged lands and (2) that the Hamiltons' claims against the defendants sued in their official capacities were barred under Eleventh Amendment sovereign immunity. We REMAND to the district court for further proceedings not inconsistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0064P (6th Cir.)
File Name:  02a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JAMIE HAMILTON, et al.,
    *Plaintiffs-Appellants,*

    *v.*               No. 00-5189

GARY T. MYERS, Executive Director of the Tennessee Wildlife Resources Agency, et al.,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 97-01261—J. Daniel Breen, Magistrate Judge.

Argued:  April 26, 2001

Decided and Filed:  February 21, 2002

Before:  SILER and MOORE, Circuit Judges; STAGG,
District Judge.[*]

————————————

[*]The Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

---

### COUNSEL

---

**ARGUED:** Vincent A. Sikora, THE SIKORA LAW FIRM, Piney Flats, Tennessee, for Appellants. Elizabeth P. McCarter, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** Vincent A. Sikora, THE SIKORA LAW FIRM, Piney Flats, Tennessee, for Appellants. Elizabeth P. McCarter, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

---

### OPINION

---

STAGG, District Judge.    Plaintiffs-appellants Jamie Hamilton and Bonnie Hamilton, owners of lakeshore real property on Reelfoot Lake in Obion County, Tennessee, brought this action pursuant to 42 U.S.C. § 1983 against Gary Myers, Executive Director of the Tennessee Wildlife Resources Agency ("TWRA"), the thirteen members of the Tennessee Wildlife Resources Commission ("TWRC") in their official capacities, and against ten employees of the TWRA in their individual capacities. The plaintiffs-appellants sought monetary, declaratory, and injunctive relief, contending that the removal of their boat, duck blinds, and duck decoys from Reelfoot Lake by the defendant-appellee employees of the TWRA constituted an illegal search and seizure and a denial of due process under the Fourth, Fifth, and Fourteenth Amendments. The district court granted summary judgment for the defendants, holding (1) that the claims against the defendants sued in their official capacities were barred under Eleventh Amendment sovereign immunity; alternatively, (2) that the plaintiffs failed to state a claim under section 1983 because they could not establish a constitutionally protected property interest in Reelfoot Lake or its submerged lands; and (3) the claims for damages against the defendants sued in their individual capacities were

No blind may be constructed, or repaired, or any floating blinds moved onto the area that has not met the deadline for registering the blind and displaying the registration number, as prescribed. Unregistered and/or unnumbered blinds are subject to removal at the discretion of the area manager or a designee of the Tennessee Wildlife Resources Agency.

Tenn. Comp. R. & Regs., ch. 1660-1-2.02(3)(c)10. Upon orders from the TWRA regional office, TWRA officers removed the Hamiltons' property (boat, blind and decoys) from the lake.

The Hamiltons argue that the TWRA had no authority to remove their properly registered boat because the TDEC has the power to regulate navigability on Reelfoot Lake. Furthermore, they contend that the boat should not be treated as a component of the blind because, in 1996, the regulatory meaning of the terms "blind" and "floating blind" were ambiguous. The TWRA acknowledged the terms' ambiguity. The Hamiltons argue that any ambiguity as to what structures could be removed from the lake militate against qualified immunity. Ambiguity, however, argues in favor of qualified immunity. Regulations did not prohibit TWRA officers from removing floating blinds with a boat component. The record does not provide a clear description or any pictures of how the blind was affixed to the boat (which was aluminum, 14 to 16 feet in length, and had no motor) but, as the blind was attached to the boat, it would have been reasonable for the officers to conclude that the boat was a component of the blind in that it provided the "float."

Additionally, defendants are shielded from plaintiffs' claim that the retention of their property for ten days violated their Fifth and Fourteenth Amendment rights. In *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908 (1981), the Supreme Court stated that in many situations it is impracticable or impossible to provide an opportunity to be heard before the initial deprivation of a property interest. In those instances, the requirements of due process are met if the state provides an

Justice McKinney cited a wealth of authority to illustrate the proposition that he who undertakes to avail himself of a privilege granted by the State must do so on whatever terms and conditions the State chooses to annex to the exercise of the privilege, including the waiver of constitutional rights.

*Monroe*, 253 S.W.2d at 735-36.

TWRA officers' search of the Hamiltons' boat, blind, and decoys was within their authority. After spotting a floating blind in what they considered to be TWRA-administered waters, TWRA officers inspected the blind. The statutes and jurisprudence discussed above authorized them to inspect the blind without a search warrant. Upon inspecting the blind, officers found that it had no registration number affixed to it, which communicated to the officers that it was not registered as a permanent or annual draw blind, and they observed shot gun shells on its floor. Thus, the officers presumed the blind to be a "temporary" blind and, as such, the blind should not have been on the lake. Unlike permanent and draw blind sites, no registration is required for temporary blinds, but state regulations require that a temporary blind be removed from the lake at the end of each day's hunt. *See* Tenn. Comp. R. & Regs., ch. 1660-1-2-.02(3)(c)6 and 8.

The defendants-appellees also acted within their authority when they removed the Hamiltons' property from Reelfoot Lake. Regulations provided ample notice to the Hamiltons that their property could be removed from the lake. Before the property was removed, defendants confirmed that the floating blind was not a registered permanent or draw blind site. Therefore, they treated the blind as temporary. State regulations provide that "[h]unters may hunt from temporary cover provided that all decoys and materials are removed at the end of each day's hunt." *See* Tenn. Comp. R. & Regs., ch. 1660-1-2-.02(3)(c)8. The Hamiltons' blind was discovered after the hunting day had ended. The regulations also permit the removal of illegal, floating blinds from Reelfoot Lake:

dismissed because those defendants were entitled to qualified immunity. Plaintiffs-appellants appeal the district court's grant of summary judgment.

For the reasons set forth below, we AFFIRM the district court's dismissal of the claims against the defendant-appellee employees of the TWRA sued in their individual capacities under the doctrine of qualified immunity, but REVERSE the district court's holdings that the plaintiffs-appellants' claims against the defendants sued in their official capacities were barred under Eleventh Amendment sovereign immunity, and that there was no genuine issue of material fact as to whether the plaintiffs-appellants had constitutionally protected property interests in Reelfoot Lake or its submerged lands. Accordingly, we REMAND to the district court for further proceedings.

## I.    BACKGROUND

Jamie and Bonnie Hamilton ("Hamiltons") own real property in Obion County, Tennessee that extends to the ordinary low water mark of Reelfoot Lake. On their real property, the Hamiltons own and operate Hamilton's Resort, which features a motel and areas for tent camping and trailer parking. The resort is primarily frequented by hunters and fishermen. By virtue of a Doherty land grant,[1] the Hamiltons

---

[1] In 1788, the State of North Carolina granted to revolutionary war Colonel George Doherty several tracts of land totaling several thousand acres in an area that was to become Western Tennessee. *See Webster v. Harris*, 69 S.W. 782, 788-89 (Tenn. 1902). Tennessee became a state in 1796, and approximately in 1810, an earthquake formed Reelfoot Lake and submerged portions of the "Doherty" grants. In 1913, the Supreme Court of Tennessee held that as the Doherty lands were "grantable by North Carolina, and were subject to private ownership before the formation of the lake . . . the mere fact that they have since become submerged by a body of navigable water does not deprive their owners of their title to the land as long as they can be reasonably identified." *State ex rel. Cates v. West Tennessee Land Co.*, 158 S.W. 746, 747 (Tenn. 1913). In addition, the court held that "[u]pon all authorities, this title and ownership will carry with it the exclusive right of fishery in the waters over these grants." *Id.*

also claim to own a portion of the Reelfoot Lake bed that adjoins their real property. Nearly 30 years before the present litigation, Jamie Hamilton placed a light pole in the lake bed of Reelfoot Lake approximately 200 yards from the shore of his real property. Claiming Doherty riparian rights at the pole's location, the Hamiltons contend that the pole is outside the wildlife management area administered by the TWRA. The pole stood in four feet of water and was frequently used by the Hamiltons as a site to fish, hunt, and moor boats. Jamie Hamilton moored a boat to the light pole on November 16, 1996 and, after leaving the boat, returned later that day to discover that it had been removed from the lake.

November 16, 1996 was the first day of the duck hunting season at Reelfoot Lake. On that day, TWRA enforcement officers were instructed to search the lake for illegal and unregistered blinds, including riparian blind sites. After the official end of the day's hunt, *i.e.*, 3:00 p.m., and about thirty minutes before sundown, TWRA officers observed a duck blind in the water at least 200 yards from the shore of the Hamiltons' property. Upon closer inspection, they discovered that the blind was attached to a boat and was camouflaged. The boat, which was made of aluminum, measured fourteen to sixteen feet in length, had no motor, was moored to the Hamiltons' light pole, and was surrounded by duck decoys. Additionally, officers observed that there were shot gun shells on the floor of the blind and that, while the blind had a bright sign stating that it was a "riparian duck blind," no TWRA registration number was displayed on the blind. The officers did not look for a registration number on the boat.

The officers determined that the blind was located within waters administered by TWRA and that the location of the blind was not a registered permanent or draw blind site, and therefore, that the blind was illegal. The Hamiltons did not have a permanent registered or draw blind site on Reelfoot Lake on November 16, 1996. A few hours after the blind was discovered, TWRA officers received orders from the TWRA regional office to remove the items found at the pole from the lake. Without notice, consent, or a warrant, they removed the

the TWRA; and c) that all property was returned to the Hamiltons ten days after it was removed.

The defendants-appellees' search of the Hamiltons' property did not violate the Hamiltons' rights. The TWRA has broad enforcement over Tennessee wildlife laws. *See* Tenn. Code Ann. § 70-1-305. Specifically, the TWRA is authorized to administer activities at Reelfoot Lake. *See* Tenn. Code Ann. § 70-1-305(11). Among other things, the TWRA has the power to "[e]nforce all laws relating to wildlife, and to go upon any property, outside of buildings, posted or otherwise, in the performance of the executive director's duties." Tenn. Code Ann. § 70-1-305(1). A boat or blind can be searched at any time during hunting season. *See* Tenn. Code Ann. § 70-6-201. Furthermore, section 70-6-101 imposes a duty on wildlife officers to ascertain whether requirements of wildlife statutes and regulations are being followed. *See Hughes v. State*, 259 S.W.2d 527 (1953). Thus, TWRA officers clearly have the authority to go on property to inspect visible waterfowl blinds during an open hunting season.

Everyone who participates in the privilege of hunting has a duty to permit inspections to determine whether they are complying with applicable laws. *See* Tenn. Code Ann. § 70-6-101(b). Hunting and fishing are regulated activities under both state and federal law. The Supreme Court has found that a warrantless search of a regulated industry or business is reasonable. *See, e.g.*, *New York v. Burger*, 107 S. Ct. 2636, 2644 (1987). In *Monroe v. State*, 253 S.W.2d 734 (Tenn. 1952), the Supreme Court of Tennessee reaffirmed the right of game wardens to make inspections and conduct searches without warrants when it is clear that someone has been exercising hunting privileges. In discussing *State v. Hall*, 51 S.W.2d 851 (Tenn. 1932), the court stated:

In the Hall case it was not expressly held that the Act authorized Game Wardens to make searches without search warrants but such is clearly the inescapable implication. This Court speaking through the late Mr.

will be insulated by qualified immunity. *Painter*, 185 F.3d at 567. Thus, even if a public officer has deprived the plaintiff of a federal right, qualified immunity will apply if an objectively reasonable official would not have understood, by referencing clearly established law, that his conduct was unlawful. *See id*. (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1714 n. 5 (1998)).

"In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Id*. (quoting *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir.1993))(citation omitted). "The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Id*. (quoting *Rich v. City of Mayfield Hts.*, 955 F.2d 1092,1095 (6th Cir. 1992)). Claims of qualified immunity are assessed on a fact-specific basis to ascertain whether the particular conduct of the defendant state employee infringed a clearly established federal right of the plaintiff, and whether an objectively reasonable officer would have believed that his conduct was lawful under extant federal law. *See id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)). Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must be resolved by a fact finder at trial. *See id*.

The Hamiltons argue that the TWRA employees named as defendants in their individual capacities violated their rights under the Fourth, Fifth, and Fourteenth Amendments because they participated in an unlawful seizure of their boat, duck blind, and duck decoys. The defendants-appellees argue that they are entitled to qualified immunity because they acted within their authority. The parties do not dispute a) that TWRA employees removed the Hamiltons' boat, blind, and decoys from Reelfoot Lake on November 16, 1996; b) that the blind site from which they were removed, the pole near the Hamilton Resort, was neither registered with nor permitted by

boat, floating blind, and decoys from the lake and transported them to a Reelfoot Wildlife Management Area facility.

After the boat was removed from the water, officers discovered that it had registration numbers on it, and that it was registered to the Hamiltons. Upon discovering that his boat, blind, and decoys were missing, Jamie Hamilton demanded their immediate return or a citation. The TWRA would not return the boat to Mr. Hamilton, however, until after it conducted further investigation. Mr. Hamilton was never cited for any violation and, after ten days, the items seized were returned to him.

On November 12, 1997, the Hamiltons filed the present action pursuant to 42 U.S.C. § 1983 in the Western District of Tennessee. On January 27, 1998, all parties agreed to stay federal proceedings pending resolution of a related action in Tennessee state court. The Hamiltons' state action alleged the same basic facts and causes of action as their federal suit, but also named the TWRA and TWRC as defendants. A Tennessee circuit court granted the defendants-appellees' motion to dismiss, but a Tennessee appeals court held that the action against the individual officers should not be dismissed. *See Hamilton v. Cook*, No. 02A01-9712-CV-00324, 1998 WL 704528 (Tenn. Ct. App. 1998). On April 13, 1999, the Hamiltons' motion to voluntarily dismiss their remaining claims against the individual officers was granted by a state court. Thus, the stay of their federal action was lifted on July 14, 1999, and the Hamiltons filed an amended complaint.

The Hamiltons contend that the November 16, 1996 removal of their boat, blind, and decoys constituted an illegal search and seizure and a denial of due process under the Fourth, Fifth, and Fourteenth Amendments. They seek monetary, declaratory, and injunctive relief. Specifically, they seek: a) declaratory judgment against TWRA employees (defendants sued in their individual capacities) in the amount of $1,000 compensatory and $10,000 punitive damages; b) declaratory judgment that enforcement of the TWRA permit program violated their constitutional and civil rights,

and that the TWRA/TWRC be enjoined from enforcing the permit program against them; c) declaratory judgment that the use of their Doherty portion of the lake by non-riparians created a nuisance and, thus, that the TWRA/TWRC be enjoined from permitting such non-riparian use; and d) declaratory judgment that plaintiffs have riparian rights -- including fishing, hunting, travel, and the ability to construct a pier or dock on the lake bed -- and that defendants be enjoined from interfering with any attempt by plaintiffs to extend their dock.

On April 21, 1999, the defendants-appellees moved the district court for summary judgment. On January 12, 2000, the district court granted the motion for summary judgment on the following grounds: (1) the claims against defendants sued in their official capacities were barred under the Eleventh Amendment; (2) alternatively, the Hamiltons could not establish a constitutionally protected property interest in Reelfoot Lake or the land thereunder; and 3) the defendants sued in their individual capacities were entitled to qualified immunity. The Hamiltons appeal the district court's grant of the defendants-appellees' motion for summary judgment.

## II.    ANALYSIS

### A.    Standard Of Review.

This court reviews a district court's grant of summary judgment de novo. *See Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 774 (6th Cir. 1996). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is not a genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed R. Civ. P. 56(c). The non-moving party may not rely on his pleadings alone, but must demonstrate the existence of a genuine issue for trial by pointing to "specific facts" that create such an issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986). In making this determination, a judge may not make credibility determinations or weigh the evidence. *See*

hundred eighty-two and four-tenths (282.4) mean sea level which is also the top of the twenty (20) floodgates at the Reelfoot Lake spillway dam."

Evidently, it is the case that the current water level of Reelfoot Lake is approximately 282.4 feet – the same level the lake was at in 1925. The Hamiltons allege that, starting in 1917, the State of Tennessee constructed a series of spillways or dams progressively raising the lake's water level from 276 feet to its present level. According to a 1985 United States Geological Survey, a 276-foot water-surface elevation covers 4,660 acres in surface area while a 282-foot water-surface elevation covers 14,800 acres. The Hamiltons claim to own portions of Doherty grant 51 submerged after 1913, and a genuine issue for trial exists as to the extent of their ownership of the Reelfoot Lake lake bed. If the Hamiltons can establish ownership of Doherty lands submerged after 1913, the Hamiltons have protected riparian rights in the waters above those lands.

### D.    Qualified Immunity.

Finally, the Hamiltons contend that the district court erred when it dismissed their claim for monetary damages against the defendants-appellees named in their official capacities under the doctrine of qualified immunity. Qualified immunity is a question of law and, as such, is reviewed *de novo* by this court. *See Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000). Qualified immunity is an affirmative defense that is available to government officials performing discretionary functions. *See Painter v. Robertson*, 185 F.3d 557, 566 (6th Cir. 1999). By operation of that doctrine, government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Painter*, 185 F.3d at 566-67 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). Accordingly, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue,

property extends to the ordinary low water mark of Reelfoot Lake. As the Supreme Court of Tennessee held, as the Doherty lands were "grantable by North Carolina, and were subject to private ownership before the formation of the lake, . . . the mere fact that they have since become submerged by [Reelfoot Lake] does not deprive the owners of their title to the land as long as they can be reasonably identified." *Id*.

The Hamiltons contend, and the defendants-appellees do not dispute, that their property is subsumed within Doherty grant number fifty-one (51). In 1913, as is the case today, grant number 51 was not totally submerged, and portions of it formed parts of the shore of the lake. *See id*. As noted by the district court, the Hamiltons' 1979 warranty deed states that the Hamiltons' property on Reelfoot Lake extends to the lake's "ordinary low water mark." Because the State of Tennessee condemned grant number 51 in 1913, any land that is submerged when the lake is below its 1913 low water mark is owned in public trust by the state. However, any land that is submerged when the lake is *above* its 1913 low water mark is part and parcel of Doherty grant number 51. Thus, the key determinant of whether the Hamiltons have protected riparian rights is the location of the 1913 low water mark on Reelfoot Lake.

There is no evidence in the record affirmatively establishing the low water mark of Reelfoot Lake in 1913. The parties presented competent summary judgment evidence raising a genuine issue of material fact as to this issue. In his affidavit in opposition to the motion for summary judgment, Jamie Hamilton stated that he "saw the plans for the first spillway at Reelfoot Lake in 1917, and it showed the low water mark at 276.0 feet." This assertion, if true, is not merely conclusory and is based on a personal observation by the affiant. The defendants-appellees dispute the assertion, but do not present any evidence to the contrary. Rather, the defendants-appellees cite Tenn. Code Ann. § 70-5-113(b) which established the low water mark of Reelfoot Lake as of 1925: "[A]s first established by the Reelfoot Lake commission of 1925 . . . (1) [t]he natural ordinary low water mark is two

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## B.    Eleventh Amendment Sovereign Immunity.

The district court granted summary judgment to the defendants-appellees stating that the Hamiltons' claims were barred by Eleventh Amendment sovereign immunity because they were in the nature of a quiet title action implicating special sovereignty interests. Specifically, the district court held that the Supreme Court's decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S. Ct. 2028 (1997) mandated dismissal of the Hamiltons' claims because, according to the district court, the Hamiltons sought relief that would, in effect, invalidate the authority of state agencies to regulate and administer Reelfoot Lake. The court held that the importance of state regulatory control over, and public ownership of, Reelfoot Lake militated against the Hamiltons' claims because the relief they requested intruded too far onto the sovereignty of the State of Tennessee.

In *Coeur D'Alene*, the Supreme Court held that the Coeur d'Alene Indian Tribe's ("Tribe") suit against the State of Idaho, various state agencies, and numerous state officials in their official capacities, was barred by the Eleventh Amendment because it amounted to the "functional equivalent of a quiet title action which implicates special sovereignty interests." *Id*. at 281. The Tribe, a federally recognized sovereign nation, claimed ownership of the submerged lands and bed of Lake Coeur d'Alene, along with the navigable rivers and streams forming part of its water system, and "sought a declaratory judgment to establish its entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands as well as a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs, or usages which purport to regulate, authorize, use, or affect in any way the submerged lands." *Id*. at 265. The tribe also sought "a preliminary and permanent injunction prohibiting defendants from regulating, permitting, or taking any action in violation of the Tribe's rights of

exclusive use and occupancy, quiet enjoyment, and other ownership interest in the submerged lands along with an award for costs and attorney's fees and such other relief as the court deemed appropriate." *Id*.

The Court was troubled because the declaratory and injunctive relief sought by the Tribe was "far-reaching and invasive," and characterized the Tribe's claims as the "functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe" should the Tribe prevail. *Id*. at 282. The Court held that "under these particular and special circumstances" the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity, which generally permits suits in federal court against state officials sued in their official capacities seeking prospective equitable relief for continuing violations of federal law, did not apply. *Id*. at 287. This case is distinguishable from *Coeur d'Alene* because the Hamiltons' claims do not rise to the level of a functional equivalent of a quiet title action implicating special sovereignty interests.

The Hamiltons contend that the removal of their boat, blind, and decoys constituted an illegal search and seizure and a denial of due process under the Fourth, Fifth, and Fourteenth Amendments, and seek, in essence, prospective equitable relief in the form of a declaratory judgment as to the existence of their alleged constitutionally protected riparian rights, and an injunction preventing the state from continuing to violate their constitutionally protected riparian rights. The Hamiltons also seek $1,000 in compensatory damages and $10,000 in punitive damages against TWRA employees sued in their individual capacities. The district court's dismissal of these claims should be affirmed under the doctrine of qualified immunity as discussed *infra* at II(D). In the Hamiltons' remaining claims they seek a judicial declaration of, and an injunction protecting, their alleged exclusive riparian rights over Doherty land grants submerged under Reelfoot Lake, the existence of such rights having already been affirmatively established by the Supreme Court of Tennessee. *See State ex rel. Cates v. West Tennessee Land*

Fourteenth Amendment's protection of liberty and property. *See Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997). Only after reaching a conclusion that the interest claimed is within that protection does this court consider the form and nature of the process that is due. *See id*. (citing *Board of Regents v. Roth*, 408 U.S. 564, 570-71, 92 S. Ct. 2701, 2705-06 (1972)). Thus, in a section 1983 due process claim for deprivation of a property interest, a plaintiff first must show a protected property interest, and only after satisfying this first requirement can a plaintiff prevail by showing that "'such interest was abridged without appropriate process.'" *Id*. (quoting *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1108 (6th Cir. 1995)).

Property interests protected by the due process clause must be more than abstract desires for or attractions to a benefit. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972). The due process clause protects only those interests to which one has a "legitimate claim of entitlement." *Id*. at 577, 92 S. Ct. at 2709. This has been defined to include "'any significant property interests . . . including statutory entitlements.'" *Brotherton*, 923 F.2d 477, 480 (6th Cir. 1991) (citations omitted). As previously stated, property interests are not created by the Fourteenth Amendment, rather they are created and defined by independent sources, such as state law. *See id.* at 480 (quoting *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709). State supreme court decisions are controlling authority for such determinations. *See id*.

As noted in the discussion *supra* in section II(B), the Hamiltons are claiming entitlement to riparian rights already determined by the Supreme Court of Tennessee to be protected property rights incident to the ownership of land submerged by Reelfoot Lake. *See State ex rel. Cates v. West Tennessee Land Co.*, 158 S.W. 746, 752-53 (Tenn. 1913). The district court held, however, that the Hamiltons were unable to reasonably identify the areas of land submerged by the lake to which they claim ownership because their deed to their real property on the lake merely establishes that their

exception applies in this case. The principal opinion in *Coeur d'Alene*, written by Justice Kennedy, espouses a case-by-case, rather than a rule-based approach, to the application of the *Ex Parte Young* doctrine. *See Coeur d'Alene*, 521 U.S. at 277-82, 117 S. Ct. at 2038-2040. Nevertheless, this portion of the principal opinion failed to muster a majority of the Court. In fact, a majority of the court, including the four dissenting justices and the three justices joining in the concurring opinion, rejected Justice Kennedy's balancing approach, and held that it would continue to apply the *Ex Parte Young* rule as it has been traditionally understood. *See id*. at 296, 117 S.Ct. at 2047 (O'Connor, J., concurring (joined by Scalia and Thomas, JJ.); *see also id.* at 297, 117 S.Ct. at 2047-48 (Souter, J., dissenting (joined by Stevens, Ginsburg, and Breyer, JJ.)). In short, "[a] *Young* suit is available where a plaintiff alleges an *ongoing* violation of *federal* law, and where the relief is *prospective* rather than *retrospective*." *Id*. at 294, 117 S.Ct. at 2046 (O'Connor, J., concurring) (emphasis in original). This case falls within the *Ex Parte Young* exception, and the district court erred when it held that this suit was barred by Eleventh Amendment sovereign immunity.

## C. Procedural Due Process And Protected Property Interests.

The Hamiltons contend that the district court erred in its alternative holding that the defendants-appellees are entitled to summary judgment on the ground that the Hamiltons were unable to establish a constitutionally protected property interest in the waters of Reelfoot Lake or the land thereunder. In essence, the district court held that, by virtue of the State of Tennessee's ownership of Reelfoot Lake in public trust and the Tennessee legislature's enactments empowering state agencies to regulate the lake, even if the Hamiltons are Doherty land owners, they have no constitutionally protected property interests in their submerged land.

In considering procedural due process claims, this court first determines whether the interest at stake is within the

*Co.*, 158 S.W. 746, 752 (Tenn. 1913). The question to be decided in this case is whether the Hamiltons themselves are entitled to enjoy and enforce these rights.

As alluded to *supra* at note 1, in 1913, the Supreme Court of Tennessee delineated the respective rights of the public and private individuals in the ownership and use of the waters of Reelfoot Lake and the land thereunder. *See State ex rel. Cates*, 158 S.W. at 752-53. The court held that Reelfoot Lake was a "navigable stream" in the "technical sense," meaning that "the rights of the public attach to it, to its use, and to its fisheries, so that it is incapable of private ownership, and the state owns it in public trust for all the people, and cannot alienate it away." *Id*. at 752. With that said, however, the court continued its discussion as follows:

Does the fact that the Doherty grants were submerged by the lake after they were granted, and are now the bed of a navigable stream, deprive the owners of the submerged land of their title to the lands and their right to claim the fisheries in the waters lying over them? Upon this particular question, we have not been cited to any authority directly in point, and we have found none. It would seem, on principle, that the title to the land would be unaffected by the formation of the lake, and its owners would be entitled to its use and its enjoyment as long as they can reasonably identify it and fix its boundaries. It is proven in this case that the Doherty grants can still be identified, and their boundaries are reasonably well established. The waters of the lake are clear, and many of the monuments of boundary can still be identified. Grants Nos. 51, 90, and 31 are not totally submerged, and portions of them are still upland and form parts of the shore of the lake. Grant No. 161 is entirely submerged; but its boundaries are located, and it is platted on the map. As these lands were grantable by North Carolina, and were subject to private ownership before the formation of the lake, we are of opinion that the mere fact that they have since become submerged by a body of navigable water does not deprive the owners of their title

to the land as long as they can be reasonably identified. Upon all of the authorities, this title and ownership will carry with it the exclusive right of fishery in the waters over these grants.

*Id*. In light of this discussion, the court concluded that the State of Tennessee was "entitled to a decree establishing its title in trust for all the people to all that portion of the lake, its fisheries and fowling privileges, *lying outside of, and not over and above*, the grants issued by the state of North Carolina to Doherty." *Id*. at 753 (emphasis added).

It is evident that the Hamiltons are claiming entitlement to riparian rights already determined by the highest court of the State of Tennessee to be valid property rights incident to the ownership of land submerged by Reelfoot Lake. Property interests are not created by the Fourteenth Amendment, rather they are created and defined by independent sources, such as state law. *See Brotherton v. Cleveland*, 923 F.2d 477, 480 (6th Cir. 1991). State supreme court decisions are controlling authority for such determinations. *See id.* at 480. The Supreme Court of Tennessee has specifically stated that the rights of the public attach to Reelfoot Lake and to its use, but only to those portions of the lake not over and above Doherty grants. Unlike the Tribe in *Coeur d'Alene*, the Hamiltons are not seeking to divest sovereign ownership of Reelfoot Lake from the state, or seeking entitlement to the exclusive use and occupancy of the lake. Nor are the Hamiltons seeking to invalidate the regulatory authority of the Tennessee agencies in this case.

If the Tribe in *Coeur d'Alene* had prevailed, Lake Coeur d'Alene would have been annexed to the sovereign control of the Tribe, effectively placing the lake beyond the jurisdiction of the State of Idaho. Justice O'Connor, in her concurring opinion in *Coeur d'Alene*, characterized the Tribe's suit as follows:

First, as the Tribe concedes, the suit is the functional equivalent of an action to quiet its title to the bed of Lake Coeur d'Alene. It asks a federal court to declare that the

lands are for the exclusive use, occupancy, and enjoyment of the Tribe and to invalidate all statutes and ordinances purporting to regulate the lands. The Tribe could not maintain a quiet title action in federal court without the State's consent, and for good reason: A federal court cannot summon a State before it in a private action seeking to divest the State of a property interest . . . . Second, the Tribe does not merely seek to possess land that would otherwise remain subject to state regulation, or to bring the State's regulatory scheme into compliance with federal law. Rather, the Tribe seeks to eliminate altogether the State's regulatory power over the submerged lands at issue--to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 289, 117 S. Ct. 2028 (1997) (O'Connor, J., concurring). If the Hamiltons prevail at trial, Reelfoot Lake will remain within the sovereign control of the State of Tennessee, and will continue to be subject to Tennessee's regulatory authority. At most, if the Hamiltons prevail, the State of Tennessee will be required to tailor its regulatory scheme to respect the Hamiltons' constitutionally protected riparian rights – something the state may be required to do for all owners of submerged Doherty land in accordance with the jurisprudence of the Supreme Court of Tennessee. The relief sought by the Hamiltons in this case does not begin to approach the far-reaching and invasive relief sought by the Tribe under the particular and special circumstances of *Coeur d'Alene*, and this court does not read the ruling of *Coeur d'Alene* to extend to the facts of this case.

Eleventh Amendment sovereign immunity does not bar the Hamiltons' claims for equitable prospective relief. The Hamiltons seek prospective relief to enjoin Tennessee officials from committing continuing violations of federal law, namely violation of their rights under the Fifth and Fourteenth Amendments, and therefore, the *Ex Parte Young*