**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0476n.06

**Case No. 14-1916**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 29, 2015
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| STEVEN C. JAHN, *Personal Representative of the Estate of Steven Jacob Jahn, Deceased*, | ) ) ) | |
| *Plaintiff-Appellant*, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| WILLIAM T. FARNSWORTH, THOMAS L. VALKO, PATRICIA L. SPEILBERG, and MARYSVILLE PUBLIC SCHOOLS, | ) ) ) ) | |
| | ) | **O P I N I O N** |
| *Defendants-Appellees*. | | |

**BEFORE:** McKEAGUE and DONALD, Circuit Judges; MATTICE, District Judge.[*]

**MATTICE, District Judge.** Plaintiff-Appellant Steven C. Jahn appeals the district court's order granting Defendants' Motion for Summary Judgment on his claims for procedural and substantive due process violations brought pursuant to 42 U.S.C. § 1983. Plaintiff timely appealed, and we now **AFFIRM** the district court's dismissal of Plaintiff's claims.

**I. Background**

Plaintiff-Appellant is Steven C. Jahn, who brought this suit as the Personal Representative of the Estate of his deceased son, Steven Jacob Jahn ("Jake"). Jake was a

---

[*]The Honorable Harry S. Mattice, Jr., District Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

senior student at Marysville Public Schools ("Marysville") in March 2012. Defendant William T. Farnsworth was the Principal of Marysville. (Doc. 36-2 at 3). Defendant Thomas L. Valko was the Assistant Principal of Marysville. (Doc. 36-3 at 5). James Cain was the superintendent of Marysville, but Defendant Patricia L. Speilberg was the acting superintendent of Marysville on the day of the incident. (Doc. 41-3 at 62).

On March 16, 2012, Kirk Smith, a teacher at Marysville, noticed that his laptop computer was missing from his classroom. (Doc. 36-9 at 2). The laptop was valued at $2,000 and contained information regarding students' assignments and tests as well as confidential student information under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232(g). (*Id.*). That afternoon, Smith reported the laptop missing to Cain and Speilberg. (*Id.*). Speilberg contacted the Technology Director at Marysville, Mike Rutallie, to access the camera security system and to review the videos taken by the camera. (*Id.*). Rutallie informed Speilberg that the computer's last activity was at 2:58 p.m., which is near the time that Jake left Smith's classroom. (*Id.*). Rutallie and Speilberg did not see any other students leave the area when Jake exited the classroom. (*Id.*).

On March 19, 2012, Farnsworth, Valko, and Speilberg suspected that Jake had taken Smith's laptop. (Doc. 36-16). They spoke with their attorney on the phone, and he recommended that they turn the matter over to the police. (Doc. 36-2 at 8). They decided to "keep this a school issue" and not involve the police. (Doc. 36-2 at 8).

On the morning of March 19, 2012, at approximately 11:00 a.m., Farnsworth and Valko had an interview with Jake in Farnsworth's office regarding the allegations. (Doc. 36-12 at 2). During that interview, Farnsworth explained Jake's due process rights. Farnsworth also informed Jake that he had evidence of the incident, including two videotapes that monitored the corridors

surrounding the classroom where the laptop was taken and "a time stamp of when the computer was woken up." (Doc. 36-2 at 4). Jake asked to see the video evidence, but Farnsworth testified that he did not have the opportunity to show it to him because he did not have it in his office. (Doc. 41-10 at 13). The video evidence was on a computer in Valko's office. (Doc. 36-3 at 9). Farnsworth explained to Jake that there would be consequences for his actions including a 10-day suspension from the building and a recommendation of long-term suspension. (Doc. 36-2 at 4). From Farnsworth's perspective, the interview lasted approximately 40 minutes.[1] (Doc. 36-2 at 8).

During the course of the interview, Jake admitted to taking the computer and informed Farnsworth and Valko that the computer was in his bedroom. (Doc. 36-2 at 4). At this point, Valko called Jahn and informed him of what had happened. (Doc. 26-2 at 4). Jake spoke with his father and told him where to find the computer in his room. (Doc. 41-5 at 43). Jahn retrieved the computer and brought it to the school at around 12:05 or 12:10 p.m. (Doc. 36-6 at 14). Upon review of the computer, school officials found that Jake had "reimaged" the computer, installed different versions of software, and reset the username and password. (Doc. 36-9 at 3).

Farnsworth and Valko were concerned that Jake may have taken other items that had gone missing at the school. (Doc. 36-6 at 10). When they asked Jake whether he had taken the items, he answered that he had not. (*Id.*). Jahn testified that Farnsworth and Valko told Jake that they were going to contact Michigan State University, the college that Jake planned to attend, and the police department about this incident and that Jake would be convicted of a felony if he

---

[1] As the district court noted, Jahn disputes what was said at this initial hearing but does not have any evidence supporting his position because he was not present at the hearing.

did not admit that he had taken the other items.[2] (*Id.*; Doc. 41-14 at 31). Jake maintained that he had not taken any other items. (*Id.* at 11).

During the meeting, Farnsworth searched Jake's backpack and found an iPad. (Doc. 36-2 at 10). Farnsworth suggested that Jake may have stolen the iPad. (Doc. 36-6 at 10). Jahn told Farnsworth to hold onto the iPad until he found a receipt, and then picked up the iPad the next day. (*Id.*).

Jahn was upset with Jake for taking the laptop. (Doc. 36-16 at 2). Jahn testified that Farnsworth and Valko told him that Jake was suspended for the remainder of the year. However, Jake would be permitted to finish his classes from home for full credit and take his AP test for college credit; Jake would not be permitted on school grounds for commencement, prom, or other school functions.[3] (Doc. 36-6 at 13).

Valko escorted Jake off the premises to his car around 12:45 p.m. to make sure that he left the school grounds. (Doc. 41-5 at 46). Jake became upset as they were walking to his car because he was worried that his father was angry with him and was generally upset about the suspension. (Doc. 36-3 at 10). Valko had a conversation with Jake and told him that he would be fine; Jake shook his hand and thanked him for not involving the police. (*Id.* at 22). While Valko was walking Jake to his car, Farnsworth and Jahn met privately. (Doc. 36-16 at 3). Farnsworth told Jahn that he had to "work on [Jake] for a while" and described Jake as "very cold, calculating, and unremorseful." (*Id.* at 13). After Valko dropped Jake off at his car, he returned to the office and told Jahn that he should keep an eye on Jake because he thought that he needed some support. (Doc. 36-3 at 10).

---

[2] Defendants dispute whether this exchange occurred. (Doc. 36-3 at 12).
[3] Defendants testified that Farnsworth and Valko informed Jahn that Jake would be suspended for ten days with the recommendation that he would be suspended for the rest of the school year.

After the meeting, Speilberg emailed Cain indicating that she intended to recommend that Jake be suspended for the remainder of the year. (Doc. 36-4 at 4). Jake was suspended from school indefinitely in Marysville's school discipline system, and the discipline system generated a letter to be sent to Jahn the next day regarding the suspension. (Doc. 36-13 at 2; Doc. 36-14 at 2).

Jake and his father each arrived home around 12:50 p.m. (Doc. 36-6 at 14). Jake's grandfather remained home with him and Jahn and his wife, Crystal Jahn, returned back to Marysville and met with Valko. (*Id.*). Crystal Jahn asked Valko whether this incident would end his school career after twelve years of being a good student, and he told her that Jake was "done." (Doc. 36-6 at 16). Jahn interpreted this to mean that Jake was suspended for the remainder of the school year. (*Id.*).

When they returned home around 2:00 p.m., Jake was still with his grandfather and was quiet and withdrawn. (*Id.* at 17). Jahn took Jake with him to pick up his younger brother, Zak, at the YMCA in Port Huron around 3:30 p.m. and when they returned home Jake went to his room. (Doc. 36-6 at 18). Around 5:30 p.m., Jahn realized that Jake was no longer at home. (*Id.*). Jake left his cell phone and his keys at home and used a spare key to drive his car. (*Id.* at 19).

At approximately 8:30 p.m., three Marysville police officers came to Jahn's house and asked him to call a phone number of a detective in Lapeer County. (*Id.* at 22). The detective informed Jahn that Jake had died in a car accident. (*Id.*). The Lapeer County Sheriff's Department investigated the accident and determined that Jake had driven his car into a concrete pillar. The car quickly caught fire, and the driver did not get out of the car. The medical examiner concluded that the cause of death was suicide and noted that Jake died of traumatic

injuries in the car. (Doc. 36-20). Farnsworth called that evening, and Jahn told him that he did not want to talk with him and to not call back again. (Doc. 36-6 at 23).

Under the Marysville Student Code of Conduct ("Code of Conduct"), theft or possession of stolen property is listed as a major offense. (Doc. 36-10 at 3). On September 6, 2011, Jake and his stepmother, Crystal Jahn, signed and acknowledged that they had reviewed and understood the rules found in the Code of Conduct. (Doc. 36-11 at 2). The Code of Conduct describes Marysville Public Schools Board of Education ("the Board") policy and procedure for suspending or expelling a student as follows:

(1) a student violates the Code of Conduct;

(2) the Assistant Principal notifies the student's parent of the violation and the consequences;

    (a) the student is subject to a short-term suspension of up to ten days;

    (b) the student is subject to a long-term suspension of a time period between ten and one hundred and eighty days;

    (c) the student is expelled from the school;

(3) the Assistant Principal sends written notice of the violation, consequences, and appeal procedures;

(4) the parent must contact the Principal if they wish to appeal the suspension or expulsion within three days after the notification;

(5) the Principal schedules a meeting with the parent within ten school days;

(6) if the parent chooses to proceed with appeal, he must contact the Superintendent within three school days;

(7) the Superintendent will then schedule a meeting with the parent within ten school days and, within two days of the meeting, he will either affirm or modify the Principal's decision;

(8) the Superintendent's decision may be appealed to the Board within five school days and the Board will set a hearing within ten school days of receipt of the appeal; and

(9) the Board shall provide a written decision five school days after the hearing. (Doc. 36-10 at 3-4).

The Board publishes its bylaws and policies on Marysville's website. The policies regarding suspension authorize the Superintendent to suspend or expel a student for up to one hundred and eighty days without Board action or approval. (Doc. 36-12 at 2). A school employee is not permitted to impose a short-term suspension on a student without "giving the student notice of the charges and affording the student a hearing, meaning, at minimum, the opportunity to reply to the charge." (*Id.* at 3). The guidelines permit this notice to be oral or written and for the hearing to be held immediately. (*Id.*). At the hearing, the Board requires that the student be afforded minimal procedural due process requirements in the form of: (1) permitting the student to be present at the hearing; (2) informing the student of the charges against him; (3) informing the student of the basis of the accusation; and (4) permitting the student to defend himself against the accusations. (*Id.*). Within twenty-four hours after the suspension has been imposed, the student and guardian shall receive a written notice of the short-term suspension and the reasons for the suspension. (*Id.*). If a student is faced with a long-term suspension, the Board's policy and guidelines provide that the student shall be given written notice of the long-term suspension and the charges upon which the proposed suspension is based,

and the student will be afforded an opportunity for a formal hearing no later than ten calendar days after the date of the notice. (*Id.* at 4-5).

Jahn filed his Complaint on March 25, 2013, against Marysville, Farnsworth, Valko, and Speilberg alleging claims for (1) a procedural due process violation pursuant to 42 U.S.C. § 1983; (2) negligence; (3) a substantive due process violation pursuant to 42 U.S.C. § 1983; and (4) intentional or reckless infliction of emotional distress. On May 2, 2013, the district court declined to exercise supplemental jurisdiction over Jahn's state law claims and dismissed his claims for negligence and intentional or reckless infliction of emotional distress without prejudice. On November 8, 2013, Jahn filed an Amended Complaint against the same defendants, alleging claims for (1) a procedural due process violation pursuant to 42 U.S.C. § 1983; and (2) a substantive due process violation pursuant to 42 U.S.C. § 1983.

Defendants filed for summary judgment on May 5, 2014, and the district court issued its judgment in favor of Defendants on July 16, 2014. In deciding Defendants' motion for summary judgment, the district court concluded that Jake was afforded all of the procedural due process rights to which he was entitled in his suspension proceedings because Defendants notified Jake of the charges against him, explained the evidence that they had regarding the allegations, and gave him an opportunity to defend himself. Additionally, the district court found that Jake's procedural due process claim was undermined because he admitted that he committed the offense and the laptop computer was recovered from his room. Finally, the district court noted that any determination regarding whether Jahn would have appealed Jake's suspension if he had not committed suicide would only be based on speculation. Regarding Plaintiff's substantive due process claim, the district court concluded that Defendants did not violate Jake's substantive due process rights because Jake took his own life and thus his claim cannot fall under the state-

created-danger doctrine. The district court also concluded that Defendants are entitled to qualified immunity on both claims and that Plaintiff did not establish that Marysville was liable on the basis of municipal liability. On July 21, 2014, Plaintiff timely appealed.

## II. Standard of Review

We review *de novo* the district court's summary judgment determination, but we review "the court's findings of specific facts for clear error." *Keck v. Graham Hotel Sys.*, 566 F.3d 634, 636 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If, however, sufficient probative evidence supports a claim that disputes over material facts remain, summary judgment is not appropriate, and the case must be resolved by a judge or jury at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010).

## III. Discussion

### A.    Procedural Due Process Claim

Appellant contends that the district court erred in not recognizing two procedural due process violations. First, Appellant argues that the district court erred in finding that Defendants did not violate Jake's right to procedural due process by refusing to show him the video evidence when they met with him regarding the theft allegations. Second, Appellant argues that the district court erred in finding that Marysville did not violate Jake's right to due process when it suspended him for more than ten days without giving him a hearing before the Board.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1; *Zinermon v. Burch*, 494 U.S 113, 125-26 (1990). Procedural due process requires that a person be afforded notice and a right to be heard before the state deprives him of a property or liberty interest. *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). In reviewing an alleged violation of procedural due process, a court must first determine whether the party has identified a protected liberty or property interest, and then turn to whether the deprivation of that interest contravened notions of due process. *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002); *see Kerry v. Din*, 2015 WL 2473334, at *3 (U.S. June 15, 2015).

The United States Supreme Court recognized a student's right to procedural due process in a suspension proceeding in *Goss v. Lopez*, 419 U.S. 565. In *Goss*, the Court determined that, at the minimum, a student facing suspension from school "must be given *some* kind of notice and afforded *some* kind of hearing." *Id.* at 579 (emphasis in original). In considering this issue, the Court determined that the type of notice and hearing to which a student may be entitled depended on the competing interests of those involved. Namely, balancing the student's interest to "avoid unfair or mistaken exclusion from the educational process" and the school district's interest in efficiently maintaining a functional educational environment. *Id.* Thus, under *Goss*, a student facing suspension of ten days or less has the procedural due process right to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The notice contemplated by the Court in these situations need not be formal and there is no requirement that there be a period of time between the notice and the hearing. *See id.* at 584 (describing the

exchange as "at least an informal give-and-take between student and disciplinarian, preferably prior to the suspension").

### 1.    Defendants Were Not Required to Present the Video Evidence.

In support of his position that Defendants were required to show Jake the video evidence, Appellant relies in large part on *Newsome v. Batavia Local School District*, 842 F.2d 920 (6th Cir. 1988). In *Newsome*, we found that a superintendent's actions of withholding evidence of a confession at a due process hearing and then disclosing that evidence at a subsequent, closed deliberation did not comply with the minimum requirements for procedural due process set forth in *Goss*. When applying *Newsome* to the instant case, the district court found that *Newsome* only required an explanation of the evidence rather than revealing the evidence to the student.

The district court was correct in finding that *Newsome* is distinguishable from the instant matter because Jake and his father were aware of the evidence in Marysville's possession and had opportunity to rebut the accusation. Although Appellant argues that Jake requested to view the video and Defendants "refused to present the critical evidence" to him, *Newsome* does not support a finding that Defendants were required to show the video evidence to Jake. *Id.* at 927; *see also Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) ("Once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands.") (quoting *C.B. v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996)).

With respect to this issue, Appellant's position overstates the due process required for a school discipline proceeding, and specifically, for a long-term suspension. If the Court were to follow Appellant's line of reasoning—that school administrators are required to present evidence to the student at this abbreviated proceeding rather than simply explaining it—the Court would

be providing the student with more procedural protections than an adult accused of committing a crime. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *Loza v. Mitchell*, 766 F.3d 466, 480 (6th Cir. 2014); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) ("A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is"). Considering the nature of the liberty interests involved in a school discipline proceeding as compared to an adult criminal proceeding, the Court finds that this result would be incongruous. Rather, at this proceeding, Defendants were required to explain the evidence in their possession and give Jake an opportunity to present his version of facts. As Defendants complied with this requirement, Appellant is unable to establish a procedural due process violation on this ground.

### 2.   Jake's Discipline Was a Suspension.

Appellant next argues that the district court erred in ruling that Jake was not entitled to a "proper" hearing despite the fact that his suspension was for a period of time greater than ten days. Appellee responds that the hearing provided by Defendants satisfied the requirements identified in *Newsome*. Although *Goss* addressed suspensions of ten days or less, it did not specifically address student suspensions over ten days. *See Goss*, 419 U.S. at 584 ("Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."). This Court has addressed suspensions and expulsions on several instances, and these cases have defined the process to which students are entitled in disciplinary proceedings.

The due process required for an expulsion was discussed by this Court in *Newsome*, and we concluded that a student "faced with expulsion has the right to a pre-expulsion hearing before an impartial trier-of-fact [but] he does not have the right to a full-blown administrative appellate

process." 842 F.2d at 927; *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (discussing procedural due process in expulsion proceedings). Additionally, this Court addressed a suspension longer than ten days in *C.Y. v. Lakeview Public Schools*. 557 F. App'x 426 (6th Cir. 2014). In *C.Y.*, a student was suspended longer than ten days and then ultimately expelled, and the plaintiff argued that she was entitled to more extensive procedural due process than that set out in *Goss*. The court concluded that, although the student's suspension was slightly greater than ten days, because she was informed of the charges against her and given an opportunity to respond, the defendants satisfied the due process required by *Goss*. *Id.* at 430-31. Citing *Newsome*, the court also explained that in the case of an expulsion, students "do have a right to have the evidence against them explained and to be given an opportunity to rebut that evidence, but this right does not entitle them to know the identity of student witnesses, or to cross-examine students or school administrators." *Id.* at 431.

The most factually-analogous case regarding the due process required for a long-term suspension is *Wayne v. Shadowen*, 15 F. App'x 271 (6th Cir. 2001). In *Wayne*, the student was given a 10-day suspension and was assigned to complete the remainder of the school year off school grounds at the In-School Suspension Classroom Program. *Id.* at 290. The student argued that he was not afforded procedural due process because the school district did not provide him with a formal hearing before the school board suspended him. However, the principal investigated the allegations, interviewed the accuser, met with the student and his accomplice, gave the student an opportunity to tell his side of the story, and met with the student's father before determining the student's punishment. The court described the ultimate assignment at the In-School Suspension Classroom Program as "not tantamount to permanent and complete expulsion from the school system" because the student would continue to receive "the basic

fundamentals of a proper and an adequate education . . . with the added benefit of a monitored, disciplined environment." *Id.* (internal quotation marks omitted). Thus, the court concluded that the disciplinary action was a suspension, found that the school had provided the student with adequate procedural due process, and affirmed the ruling of the district court.

Similar to *Wayne*—and conceded by Appellant at oral argument—it is clear that, at most, Jake was subject to a long-term suspension. While it is true that an indefinite suspension for a period of more than ten days has been described as "the functional equivalent of a permanent expulsion," the suspension imposed by Defendants was never intended to be indefinite. *Ashiegbu v. Williams*, 129 F.3d 1263, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997). Rather, subject to the possibility of appellate proceedings, the suspension was intended to run the remainder of the school year during which Jake would be permitted to finish his classes from home and obtain a high school diploma. These circumstances simply do not merit characterization as an expulsion.

As a long-term suspension, Defendants complied with the due process requirements set forth in the Fourteenth Amendment as interpreted by *Goss*. At the beginning of the school year, Jake and his stepmother signed and acknowledged that they had reviewed and understood the rules found in the Code of Conduct, which determined the actions the school officials took on the day of the incident. On the date of the incident, Defendants had an informal hearing with Jake, at which point they notified him of the charges and possible consequences facing him, explained their evidence, and gave him an opportunity to defend himself. Defendants further reviewed this information when Jahn arrived with the computer, and Defendants also met with Jake's parents later that day, giving them further opportunities to be heard on this issue.

Appellant's argument, that Jake was misinformed of his due process rights and thereby deprived of his due process rights, relies heavily on the fact that Valko told Jake's parents that he was "done" when they went to speak with him on the afternoon that he was suspended. However, even if Valko did communicate this to Appellant, Valko did not have the authority to change Marysville's policy regarding student discipline. As Jake died on the evening after these events took place, any determination regarding what further actions the school would have taken to give Jake procedural due process could only be based on speculation. However, it bears noting that the discipline system had generated a letter to be sent to Jahn notifying him of the offense and punishment, as consistent with Marysville's policy. Further, Marysville's policy, which Jake and his stepmother had reviewed and acknowledged, would have permitted Jake to appeal his suspension to the superintendent and then the Board. Accordingly, the series of actions taken by Defendants satisfies the requirements set forth in both *Goss* and *Newsome*, and Jake was afforded the requisite procedural due process.

## B.      Substantive Due Process Claim

Appellant also challenges the district court's determination that it would not apply the state-created-danger doctrine to his substantive due process claim because the Sixth Circuit has not yet recognized liability under the doctrine. Specifically, Appellant submits that the district court erred in making credibility determinations and weighing evidence with respect to the third element of the doctrine. We need not reach this issue because the state-created-danger doctrine is not applicable to Appellant's claim.

A person's right to substantive due process provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Supreme Court has significantly limited the scope of

rights covered by the substantive portion of the Due Process Clause and remains "reluctant" to expand this relatively limited category of rights that are considered substantive due process rights. *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion) (holding that substantive due process claims are generally limited to those involving "marriage, family, procreation, and the right to bodily integrity"). Just like procedural due process claims, a substantive due process claim is addressed using a two-part analysis. First, the court determines whether the plaintiff has identified a protected liberty or property interest. *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 564 (6th Cir. 2012); *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001). Only after identifying such an interest will the court consider whether the deprivation of that interest contravened notions of due process. *Id.*

The United States Supreme Court has found that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). The Court reasoned that its interpretation of the Due Process Clause was supported by the fact that its language "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* Based on these considerations, the Court concluded that generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The two exceptions to this rule include the custody exception and the state-created-danger exception. *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012). As Appellant does not argue that the custody exception applies in the instant case, the only applicable exception would be the state-created-danger doctrine.

The state-created-danger doctrine consists of three elements:

(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Estate of Smithers v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) (quoting *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006)); *Cartwright v. City of Marine*, 336 F.3d 487, 493 (6th Cir. 2003). In discussing application of the doctrine, the district court noted that the Sixth Circuit has not recognized liability under the doctrine when a person has committed suicide.

When this Court confronted the application of the state-created-danger doctrine in instances of suicide in *Cutlip*, we noted that the Circuit "has never found liability under the state-created-danger doctrine where the victim committed suicide." 488 F. App'x at 115. We reiterate here that this is due in part to the high standard of proof in state-related danger cases, but also because "people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him." *Id.* at 116. District courts in this Circuit have also held that, as a general matter, when a student commits suicide, school officials are not liable under the state-created-danger doctrine. *See Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 793 (N.D. Ohio 2013) ("There can be no question that however desperate and hopeless [the student] may have perceived her alternatives to be at the time, she made the decision to take her own life."); *Mohat v. Mentor Exempted Vill. Sch. Dist. Bd. of Educ.*, 2011 WL 2174671, at *7 (N.D. Ohio June 1, 2011) (finding that Plaintiff's claim failed because the complaint allegations did not confer liability under the Fourteenth Amendment); *Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, 780 F. Supp. 2d 594, 599 (S.D. Ohio 2011).

In *Cutlip*, we discussed two cases arising out of the Tenth Circuit and the Southern District of West Virginia, that had "found or seriously entertained liability [and] involved the suicide of minors where school officials or police were in some way responsible." *Cutlip*, 488 F. App'x at 115. Appellant relies heavily on one of these cases, *Armijo v. Wagon Mound Pub. Sch.*, in which the Tenth Circuit held that the district court properly denied summary judgment as to certain defendants because the defendants knew the student was suicidal and therefore increased the risk of harm to him when sending him home without notifying his parents. 159 F.3d 1253, 1264 (10th Cir. 1998).

In *Armijo*, in analyzing whether the district court was correct in denying summary judgment, the Tenth Circuit found it significant that the state actors in the case had created a dangerous environment by driving the student home when his parents were not home, failing to notify his parents that he was suspended, and leaving the student home alone when he had access to firearms even though the student made the comment that he might be "better off dead." *Id.* at 1256-57, 1258. Considering the troubling circumstances of *Armijo*, the circuit courts that have discussed it have found it to be an outlier and factually distinguishable. *See Sanford v. Stiles,* 456 F.3d 298, 312 (3d Cir. 2006) ("*Armijo* is a far cry from this case because there was much more evidence there that school officials actually created the danger to Armijo."); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 711 (7th Cir. 2002) (finding *Armijo* distinguishable because the student was released after the school day and committed suicide off of school grounds with the school authorities having no notice that she might attempt to commit suicide); *Hasenfus v. LaJeunesse*, 175 F.3d 68, 73 (1st Cir. 1999) ("Only one circuit case cited to us has found a triable issue on anything remotely like these facts and its own facts were more aggravated.").

Consistent with this Court in *Cutlip* and other circuits, we conclude that the state-created-danger exception is not applicable to Appellant's claims because he committed suicide off of school grounds after being released into his parents' custody. The school officials in this case took appropriate action by having an initial interview with Jake after he broke the school's Code of Conduct at which he admitted to taking the laptop. The officials also discussed Jake's conduct and the possible consequences for the theft of the laptop with Jahn present and released Jake into Jahn's custody. Once Jake was released into Jahn's custody, he remained home under parental or grandparental supervision for several hours without incident. This is entirely different from *Armijo*, in which school officials dropped off the student who was mentally unstable at his home without his parents being home to supervise him. Thus, as the district court correctly concluded, this series of events does not warrant recognition of liability under the state-created-danger doctrine, and the Appellant cannot establish a due process violation.

Because we conclude that Appellant is unable to establish either a procedural or substantive due process violation, Defendants are entitled to summary judgment based on qualified immunity, and Appellant is unable to establish municipal liability against Marysville. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995).

### IV. Conclusion

For these reasons, we **AFFIRM** the judgment of the district court in all respects.